Wright, J.,
delivered the opinion of the court:
This is a bill of interpleader in equity by the United States, complainant, and the Choctaw and Chickasaw nations and the Chickasaw freedmen, defendants.
For a number of years prior to the year 1866 there resided within the territory of the Chickasaw Nation a number of persons of African descent who were held in slavery in said nation.
The treaty between the United States and the Choctaw and Chickasaw Indians, concluded April 23,1866, and proclaimed July 10, 1866, provided inter alia as follows:
“Article II. The Choctaws and Chickasaws hereby covenant and agree that henceforth neither slavery nor involuntary servitude, otherwise than in punishment of crime whereof the parties shall have been duly convicted, in accordance with laws applicable to all members of the particular nation, shall ever exist in said nations.
“Article III. The Choctaws and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby cede to the United States the territory west of the 98 west longitude known as the leased district, provided that the said sum sfrall be invested and held by the United States, at an interest not less than five per cent, in trust for the said nations, until the legislatures of the Choctaw and Chickasaw nations, respectively, shall have made such laws, rules, and regulations as may be necessary to give all the persons of African descent resident in the said nations at the date of the treaty of Fort Smith, and their descendants, heretofore held in slavery among said nations, all the rights, privileges, and immunities, including the right of suffrage, of citizens of said *560 nations, except in the annuities,-moneys, and public domain claimed by or belonging' to said nations, respectively; and also to give to such persons who were residents, as aforesaid, and their descendants, fortj^ acres each of the land of said nations on the same terms as the Choctaws and Chickasaws, to ■be selected on the survey of said land, after the Choctaws and Chickasaws and Kansas Indians have made their selections as herein provided; and immediately upon the enactment of such laws, rules, and regulations the said sum of three hundred thousand dollars shall be paid to the said Choctaw and Chickasaw nations in the proportion of three-fourths to the former and one-fourth to the latter, less such sum, at the rate of one hundred dollars per capita, as shall be sufficient to pay such persons of African descent before referred to as within ninety days after the passage of such laws, rules, and regulations shall elect to remove and actually remove from the said nations, respective^. And should said laws, rules, and regulations not be made by the legislatures of the said nations, respectively, within two years from, the ratification of this treaty, then the said sum of three hundred thousand dollars shall cease to be held in trust for the said Choctaw and Chickasaw nations, and be held for the use and benefit of such of said persons' of African descent as the United States shall remove from the said territory in such manner as the United States shall deem proper, the United States agreeing, within ninety days from the expiration of the said two years, to remove from said nations all such persons of African descent as may be willing to remove; those remaining or returning after having been removed* from said nations to have no benefit of said sum of three hundred thousand dollars, or any part thereof, but shall be upon the same footing as other citizens of the United States in the said nations.”
The legislature of the Chickasaw Nation has taken action at various times in regard to the said Chickasaw freedmen, as follows:
On November 9, 1866, the Chickasaw legislature passed an act declaring it to be the unanimous desire of the legislature that the United States hold the share of the Chickasaw Nation in the $300,000 stipulated for the cession of the “Leased district” for the benefit of the Chickasaw freedmen and remove them beyond the limits of the Chickasaw Nation, according to the third article of the treaty of 1866.
In 1868 similar action was taken by the Chickasaw legislature, asking for the removal by the United States of the Chickasaw freedmen from the Chickasaw country.
*561 The act of January 10, 1873, provided as follows:
“SECTION 1. Be it onaotecl by the legislature of the Qhiolca-saw Nation, That all the negroes belonging to the Chickasaws at the time of the adoption of the treaty of Fort Smith, and living in the Chickasaw Nation at the date thereof, and their descendants, are hereby declared to be adopted in conformity with the third article of the treaty of 1866, between the Choctaws, Chickasaws, and the United States: Provided, however, That the proportional part of the three hundred thousand dollars, specified in the third article of the said treaty, with the accrued interest thereon, shall be paid to the Chickasaw Nation for its sole use and benefit: And provided further', The said adopted negroes of the Chickasaw Nation shall not participate in any part of the said proportional part of the said three hundred thousand dollars, nor be entitled to any benefit from the principal and interest on our invested funds or claims arising therefrom, nor to any part of our common domain, or the profits arising therefrom (except the forty acres per capita provided for in the third article of the treaty of eighteen hundred and sixty-six), nor to any privileges or rights not authorized by treaty stipulations: And provided farther, That the said adopted negroes, upon the approval of this act, shall be subject to the jurisdiction and laws of the Chickasaw Nation, and to trial and punishment.for offenses against them in every case just as if the said negroes were Chickasaws.
“Sec. 2. And be it further enacted, That this act shall be in full force and effect from and after its approval by the proper authority of the United States; and all laws, or parts of laws, in conflict with this act are hereby repealed.”
That act was transmitted by the governor of the Chickasaw Nation, by letter of the same date, to the President of the United States, and was submitted by the Secretaiy of the Interior to the Speaker of the House of Representatives on February 10, 1873, with recommendation for appropriate legislation for extending the time for the execution of the third article of the treaty. The papers were referred to the Committee on Freedmen’s Affairs, but no action thereon was had at that time.
The act approved October 18 provided, inter alia, as follows:
‘c Section 1. Be it resolved by the legislature of the Ghiek-asa-iv Nation, That four commissioners, one from each county of the Chickasaw Nation, shall be elected by joint vote of the *562 senate and house of representatives of the present session of the legislature, to visit the capital of the Choctaw Nation, during the next regular session of the general council of said nation, with instructions to confer with commissioners on the part of the Choctaw Nation, and agree upon some plan whereby, the freedmen, former slaves of the Choctaws and Chickasaws, and their descendants, shall be removed from and kept out of the limits of the Choctaw and Chickasaw country.”
The act approved October 17, 1876 or 1877, provided, inter ■ alia, as follows:
“Sec. 3. Be it further enacted, That the provisions contained in article 3 of the said treaty, giving the Chickasaw legislature the choice of receiving. and appropriating the three hundred thousand dollars therein named, for the use and benefit, or passing such laws, rules and regulations as will give all persons of African descent certain rights and privileges, be, and it is hereby, declared to be the unanimous consent of the Chickasaw legislature that the United States shall keep and hold said sum of three hundred thousand dollars for the benefit of the said negroes, and the governor of the Chickasaw Nation is hereby requested to notify the Government of the United States that it is the wish of the legislature of the Chickasaw Nation that the Government of the United States remove the said negroes beyond the limits of the Chickasaw Nation, according to the requirements of the third article of the treaty of April 28, 1866.”
The act of October 22,1885, provided, vnter alia, as follows:
“ Section 1. Be it enacted iy the legislature of the Chickasaw Nation, That the Chickasaw people hereby refuse to accept or adopt the freedmen as citizens of the Chickasaw Nation upon any terms or conditions whatever, and respect'fully request the governor of our nation to notify the Department at Washington of the action of the legislature in the premises.
“Sec. 2. Be it further enacted, That the governor is hereby authorized and directed to appoint two competent and discreet men, of good judgment and business qualifications, to visit Washington City, D. C., during the next session of Congress and memoralize that body to provide a means of removal of the freedmen from the Chickasaw Nation to the country known as Ok-la-ho-ma, in the Indian Territory, or to make some suitable disposition of the freedmen question, so that they be not forced upon us as equal citizens of the Chickasaw Nation.”
*563 The resolution of October 4, 1887, provided, inter alia, as follows:
“And whereas the Chickasaw people have kindly and friendly feeling toward the freedmen, their former slaves, and wishing- them to receive full valuation of the places they live upon for their support, as provided for in section 4 of the treaty of 1866, do hereby agree that they shall have two years from the passage of this act to sell their improvements in the Chickasaw Nation to the best advantage, that no loss may accrue to them: Therefore,
“J?é it resolved by the legislature of the Ghiokasmo Nation, That the nation shall refund to the U nited States the sum of §55,000, to be used in removing the freedmen in the Chickasaw Nation to their new home, as provided under the third and fourth articles of the treat}'- of 1866, made between the United States and the Choctaw and Chickasaw nations of Indians.” (See S. Ex. Doc. 166, 50th Cong., 1st sess.)
The act of Congress of August 15,1894, section 18 (28Stat. L., 336), provides as follows:
“That the approval of Congress is hereby given to ‘An act to adopt the negroes of the Chickasaw Nation,’ and so forth, passed by the legislature of the Chickasaw Nation and approved by the governor thereof January 10, 1873, particularly as set forth in a letter from the Secretary of the Interior transmitting to Congress a copy of the aforesaid act contained in House Executive Document Numbered Two hundred and seven, Forty-second Congress, third session.”
The agreement between the United States and the Choctaw and Chickasaw tribes of Indians, dated April 23, 1897, and ratified and confirmed by the act of June 28, 1898, section 29 (30 Stat. L., 505), provides, inter alia, as follows:
“That all the lands within the Indian Territory belonging to the Choctaw and Chickasaw Indians shall be allotted to the members of said tribes, so as to give to each member of these tribes, so far as possible, a fair and equal share, thereof, considering the character and fertility of the soil and the location and value of the lands.
“The lands allotted to the Choctaw and Chickasaw freedmen are to be deducted from the portion to be allotted under this agreement to the members of the Choctaw and Chickasaw tribe so as to reduce the allotment to the Choctaws and Chickasaws by the value of the same.
“That the said Choctaw and Chickasaw freedmen who may he entitled to allotments of 40 acres each shall be entitled *564 each to laud equal in value to 40 acres of tlie average land of the two nations.”
These provisions, relative to the freedinen, are previously qualified as to their holdings of such lands by this clause in the statute—
“To be selected, held, and used by them until their rights under said treaty shall be determined, in such manner as shall hereafter be provided bj7 act of Congress.”
The agreement between the United States and the Choctaw and Chickasaw nations, made the 21st day of March, 1902, ratified and confirmed by the act of July 1, 1902, chapter 1362, provides as follows:
“11. There shall be allotted to each member of the Choctaw and Chickasaw tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to three hundred and twenty acres of the average allotable land of the Choctaw and Chickasaw nations, and to each Choctaw and Chickasaw freedman, as soon as practicable after the approval by the Secretary of the Interior of his enrollment, land equal in value to forty acres of the average allotable land of the Choctaw and Chickasaw nations to conform, as nearly as may be, to the areas and boundaries established by the Government survey, which land may be selected by each allottee so as to include his improvement's. For the purpose of making allotments and designing-homesteads hereunder, the forty-acre or quarter-quarter subdivisions established by the Government survey may be dealt with as if further subdivided into four equal parts in the usual manner, thus making the smallest legal subdivision ten acres, or a quarter of a quarter of a quarter of a section.
“13. The allotment of each Choctaw and Chickasaw freedman shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of certificate or allotment.
“15. Lands allotted to members and freedmen shall not be affected or encumbered bjr am7 deed, debt, or obligation of any charactér contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided.”
The same agreement provides as follows:
“36. Authority is hereby conferred upon the Court of Claims to determine the existing controversy respecting the relations of the Chickasaw freedmen to the Chickasaw Nation and the rights of such freedmen in the lands of the Choctaw *565 and Chickasaw nations under the third article of the treaty of eighteen hundred and sixty-six between the United States and the Choctaw and Chickasaw nations, and under any and all laws subsequently enacted by the Chickasaw legislature or by Congress.
“ 37. To that end the Attorney-General of the United States is hereby directed, on behalf of the United States, to file in said Court of Claims within sixty days after this agreement becomes effective, a bill of interpleader against the Choctaw and Chickasaw nations and the Chickasaw freedmen, setting forth the existing controversy between the Chickasaw Nation and the Chickasaw freedmen, and praying that the defendants thereto be required to interplead and settle their respective rights in such suit.”
“SectioN 40. In the meantime, the Commission to the Five Civilized Tribes shall make a roll of the Chickasaw freedmen and their descendants, as provided in the Atoka agreement, and shall make allotments to them as provided in mis agreement, which said allotments shall be held by the said Chickasaw freedmen, not as temporary allotments, but as final allotments, and in the event that it shall be finally determined in said suit that the Chickasaw freedmen are not, independently of this agreement, entitled to allotments in the Choctaw and Chickasaw lands, the Court of Claims shall render a decree in favor of the Choctaw and Chickasaw nations according to their respective interests, and against the United States, for the value of the lands so allotted to the Chickasaw freedmen as ascertained by the appraisal thereof made by the Com-' mission to the Five Civilized Tribes for the purpose of allotment, which decree shall take the place of the said lands and shall be in full satisfaction of all claims by the Choctaw and Chickasaw nations against the United States or the said freedmen on account of the taking of the said lands for allotment to said freedmen: Provided, That nothing contained in this paragraph shall be construed to affect or change the existing status or rights of the two tribes as between themselves respecting the lands taken for allotment to freedmen, or the money, if any, recovered as compensation therefor, as aforesaid.”
The said agreement between the United States and the Choctaws and Chickasaws was ratified and ^confirmed by the act of July 1,1902, as aforesaid, and was ratified in accordance with the provisions of paragraphs 73 and 74 of said agreement, by elections held on September 25, 1902, and was effective on and after that date.
The defendants answered the bill, and the hearing by the *566 court was upon the bill and answers. The facts of the bill having been, in effect, admitted by the answers, no finding of facts appear.to be' necessary, other than as recited in the decree to be entered herein.
The facts, treaties, and legislation upon which the proceedings are based are shown in the preceding statement, according to the averments of the bill of complaint filed herein, and which the court has found to be true.
It only remains for the court to declare the proper legal conclusions and to state our reasons for the same. ' By the thirteenth amendment to the Constitution, and from the date of its proclaimed ratification, December 18, 1865, the existence of slavery was impossible within the United States or any place subject to their jurisdiction, and by the force of that instrument the slaves of the Chickasaw Nation became free, and thereafter possessed the same rights incident to all other freedmen relative to life, liberty, and property. These former slaves did not become membei’s of the nation, nor entitled to share in the property held in common by members thereof. The treaty of July 10, 1866, we think recognized this principle, and by its terms provided a means whereby the f reedmen might, by consent of the tribe and the voluntary action of the former slaves, become members and be entitled to rights in the property of the nation; namely, first, by the enacting by. the nation of laws, rules, and regulations for that purpose, and, second, the acceptance thereof by the freedmen, to be manifested by the act of remaining with the nation ninety days after the adoption of such laws, rules, and regulations; or, alternately stated, by not electing to remove and actually removing from the nation within such ninety days.
The treaty permitted such action on the part of the nation to be made within two years from the ratification of the treaty, which was not done, but later, January 10, 1873, such action was taken, to take effect only after its approval by the proper authority of the United States, and which was properly submitted to Congress for that purpose, and for the further purpose of an extension of time in which to execute the provisions of such treaty. Congress took no action until August 15,1894, when it approved the act of the Chickasaw Nation to adopt the negroes, but not before the Chickasaw legislature had in *567 effect repealed its act of adoption, and thereby, and otherwise, withdrew it from the further consideration of Congress. When Congress professed to act upon the proposition of the Chickasaw Nation to adopt its former slaves there was nothing upon which that act could take effect, for that proposition had been withdrawn, and the act was ineffective and without force. The question of the power of Congress of its own motion to create the freedmen members of the nation is not before us, for Congress did not assume the exercise of such authority.
There is apparent reason to say that by the agreement and act of June 28, 1898 (30 Stat. L., 506), the previous act of Congress, by which the act of adoption was approved, was ratified by the Chickasaw Nation, wherein it is provided that the commission shall make a correct roll of the freedmen entitled to any lights under the treaty in question, and that 40 acres of land, including their present residences and improvements, shall be allotted to each of them, and such lands so allotted to the freedmen to be deducted, so as to reduce the allotment to the Indians by the value of the same. This allotment to the freedmen is, however, qualified by the further provision that the lands so allotted shall be held and used by the freedmen until their rights under the treaty shall be determined, in such manner as shall thereafter be provided by Congress. This provision could not refer to anything but the then existing and now present controversy, and was a direct recognition by Congress of the denial of the rights of the freedmen to the lands then proposed to be allotted to them, and an express saving of the rights of the Chickasaw defendant to insist upon its present contention in,'that respect; and by the act of March, 1902, Congress did provide for the determination of the rights of the freedmen under the treaty, as portended in the act of June 28, 1898. It follows, therefore, that the rights of the parties under article 3 of the treaty of July 10, 1866, remain unaffected by subsequent legislation, either of the Chickasaw Nation or Congress, and the relations of the Chickasaw freedmen to the Chickasaw Nation, and the rights of such freedmen in the lands of the Choctaw and Chickasaw nations under the third article of the *568 treaty in question are to be determined and declared according to its terms.
By that article of the treaty the Indian nations, for $300,000, cede to the United States the territory called the leased district, the money to be invested and held by the United States, at interest not less than 5 per cent, in trust for the nations until (1) they shall have made such laws, rules, and regulations as may be necessary to give their former slaves and their descendants the rights, privileges, and immunities of citizens of the nations, except annunities, moneys, and public domain claimed by, or belonging to the nations, and (2) to give to each of them 40 acres of the land of said nations on the same terms as the Choctaws and Chickasaws, to be selected on the survey of said lands, after the Indians have made their selections. Immediately upon such adoption of the freedmen the $300,000 should be paid to the Choctaw and Chickasaw nations in proportion of three-fourths to the former and one-fourth to the latter, less such sum, at the rate of $100 per capita, as shall be sufficient to pay such of the former slaves who within ninetj» days after their adoption shall elect to and actually remove from the nations. Should such adoption not be made bj^ the nations within two 3mars from the ratification of the treaty, the money shall cease to be held in trust for the Indians, and thereafter be held for the use and benefit of such of the former slaves as shall remove from the territory in such manner as the United States shall deem proper, the latter agreeing, within ninety days from the expiration of said two years to remove from the nations all negroes as might be willing to remove, those remaining or returning to have no benefit of the money, but to be upon the same footing as other citizens of the United States in said nations. The provisions of article 4 of the treaty, set forth in the bill, relative to certain concessions to the freedmen, in so far as they enlarge the rights of citizens of the United States in the nation, were intended as temporary, to exist only while the provisions of article 3 remained in fieri.
The Chickasaws have not, as has airead}»- been stated,, adopted the freedmen into their nation. The negroes have remained in the nation. It does not appear they, or any of them, were willing to remove from the nation, and the United *569 States, not- having obligated itself to do so, was under no duty to remove them without their consent. We must presume the freedmen voluntarily remained, and still so remain in the nations. Their status is therefore plainly defined by the treaty itself. Their relation to the Chickasaw Nation is, as the treaty expresses, the same as citizens of the United States in the nation, and that being true, they have no right or interest, under th.e terms of the treaty, independently of the agreement of March 21, 1902, in any of the property held in common by the members of tfie nation. Neither are those of the freedmen who remain within the nation entitled to any part of the funds in the control of the United States.
The decree of the court will be entered in conformity to the views we have expressed, to the effect that the Chickasaw freedmen are not entitled, independently of the agreement of March 21, 1902, to allotments in the lands of the Chickasaw Nation.
DECREE OF THE COURT.
• This cause coming on to be heard upon the bill of complaint of the complainant and the several answers of the respective defendants, and the court having heard the arguments of counsel of the respective parties interested herein, and thereafter having taken the said cause under advisement, and upon due consideration therfeof, being now fully advised in the premises, and of and concerning the matters in controversy, doth find that the third article of the treaty of July 10, 1866, between the United States and the Choctaw and Chickasaw nations doth and hath remained wholly unaffected by any and all laws subsequently thereto enacted by the Chickasaw legislature or by Congress, independently of the agreement between the United States and the Choctaw and Chickasaw nations made March 2, 1902, ratified and confirmed by Congress July 1, 1902; that the Chickasaw Nation has not made, put in force, or given effect to any laws, rules, or regulations necessary to give all or any persons of African descent, resident in the said nation at the date of the treaty of Fort Smith, and their descendants, theretofore held in slavery in said nation, all or any the rights, privileges, and immunities, including the right of suffrage, of citizens of said nation, nor *570 to give to such persons who were so residents as aforesaid 40 acres each of the land of said nation on the same terms, or otherwise, as the Choctaws and Chickasaws. And the court further finds that the said persons of African descent did not, nor any of them, elect to remove or remove, nor were they or any of them willing to remove from said nation, but they did and do now remain therein; that the United States did not agree to remove the said African persons, nor any of them, save only upon the condition that thejr were willing to be removed from said nation.
The court further finds that by the said act of electing to and remaining in the said nation the said persons of African descent 'forfeited all benefit to the money in said third article of said treaty mentioned, and thereafter they became in said nation upon the same footing as other citizens of the United States in said nation, and were entitled only to the rights and privileges of such citizens, and were not entitled to the 40 acres of land mentioned and described in the said third article of the said treaty of July 10, 1866.
It is therefore ordered, adjudged, decreed, and declared by the court that, under and by virtue of the third article of the said treaty of July 10, 1866, independently of the agreement made March 2, 1902, and ratified and confirmed July 1, 1902, the relations of the said Chickasaw freedmen to the Chickasaw Nation are that of citizens of the United States residing in the said nation, and that the said Chickasaw freedmen, under the said article of the said treaty, independently of the agreement and act aforesaid of 1902, have no rights in the lands of the Chickasaw Nation, nor are they, or any of them, under said article, entitled to allotments in the lands of the said Chickasaw Nation;
And it is further ordered that upon the coming in of the roll and appraisal to be made by the Dawes Commission, as referred to in the said statute, the defendants, the Choctaw and Chickasaw nations, have leave to apply for an additional decree to be entered at the foot of this decree determining the amount which shall be paid and allowed by the United States to the said Choctaw and Chickasaw nations, as directed by said statute; and that the complainant, the United States, be at the same time heard in regard to such amount for which judgment shall be rendered against the United States.