UNITED STATES FIDELITY & GUARANTY CO. v. FRENCH MUT. GEN. SOCIETY OF MUT. INS. AGAINST THEFT.

(Circuit Court of Appeals, Fourth Circuit. February 3, 1914.)

No. 1186.

1. INSURANCE (§ 683*)—REINSURANCE—LIABILITY OF REINSURER.

An insurer against loss from theft to the extent of three-fourths of the loss was reinsured by plaintiff for five years for the excess over 250,000 francs, for which it might become liable on account of any one embezzlement. It was agreed that plaintiff should procure reinsurance for 90 per cent. of the risk, and the reinsurers were to countersign the policy and accept its articles, though plaintiff remained liable to the original insurer. The gross premium paid by the original insurer was divided in proportion to the percentage of their several risks among the various insurers, one of whom was defendant, which reinsured two-tenths of plaintiff's risk. Defendant received its proportionate share of the gross premiums for three years, its policy being canceled at the end of three years by consent, subject to losses incurred prior to that time, and the share of the risk reinsured by it was reinsured for the rest of the five years by another company for the same annual premium. An employé of insured embezzled sums, three-fourths of which at the date of such cancellation aggregated less than 250,000 francs, but during the period of plaintiff's liability aggregated more than that amount. *Held,* that defendant was not liable for its proportionate share of the amount embezzled before the cancellation, as there being no excess over 250,000 francs, neither it nor plaintiff was liable at the date of the cancellation, and no subsequent embezzlement could charge defendant with liability, and its liability did not depend upon the extent of the liability of the other reinsurers, or whether they were liable.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1816; Dec. Dig. § 683.*]

2. CONTRACTS (§ 152*)—CONSTRUCTION—UNANTICIPATED CONTINGENCIES.

Where the parties to a contract fail to provide for a contingency which afterwards happens because of their failure to contemplate its possibility, the agreement must be interpreted as written, and the language employed given its natural and commonly understood meaning.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 732, 733, 738; Dec. Dig. § 152.*]

3. PRINCIPAL AND SURETY (§ 59*)—LIABILITY OF SURETY.

The liability of a surety cannot be enlarged by implication.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 103, 103½; Dec. Dig. § 59.*]

Woods, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Action by the French Mutual General Society of Mutual Insurance Against Theft against the United States Fidelity & Guaranty Company. Judgment for plaintiff (203 Fed. 558), and defendant brings error. Reversed and remanded.

J. Kemp Bartlett, of Baltimore, Md. (Edgar Allan Poe, L. B. Keene Claggett and R. Howard Bland, all of Baltimore, Md., on the brief), for plaintiff in error.

Hyland P. Stewart, of Baltimore, Md. (Warren A. Stewart, of Baltimore, Md., on the brief), for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. [1] The defendant in error, hereinafter called the plaintiff, is a French corporation engaged in the business denoted by its name. The Societe d'Assurance Mutuelle des Agents de Change de Paris, called for brevity the Brokers' Society, is likewise a body corporate of France whose members, some 70 in number, are exchange brokers in Paris. This Brokers' Society insured each of its members against three-fourths of the loss, not exceeding in any one case 1,333,333 francs, or a maximum insurance of 1,000,000 francs, occasioned by the theft or embezzlement of his employés. It sought to protect itself from excessive losses by reinsurance against any liability exceeding in a single case 250,000 francs; and, accordingly, on March 13, 1903, the plaintiff, by a policy of that date, reinsured the Brokers' Society for five years against the excess over a quarter of a million francs, and not exceeding three-quarters of a million, for which the latter might become liable on account of any one embezzlement. It was agreed, however, that 90 per cent. or more of the risk to be assumed by plaintiff should be reinsured in at least three other companies approved by the Brokers' Society, and this appears to have been of the essence of the contract between these parties.

At the end of the five years covered by the policy it was to be deemed renewed unless either party had given six months previous notice, by registered mail, of a contrary desire. The premium to be paid was at the rate of 38,000 francs a year. The reinsurers were to coun-

tersign·the policy and accept its articles, though the plaintiff remained liable to the Brokers' Society for the full performance of the contract.

The plaintiff in error, hereinafter called the defendant, became, on the date named, one of the reinsuring companies, taking two-tenths of the plaintiff's risk. The annual consideration received by defendant was 7,600 francs, less 10 per cent. retained by the plaintiff. Four other companies, in varying proportions, reinsured in the aggregate seven-tenths of the risk. The headquarters of plaintiff were at Paris, of the defendant at Baltimore, Md., of the other reinsurers at Munich, Zurich, Vienna,·and Brussels, respectively. About January 1, 1906, the Vienna company was allowed to cancel its policy as of that date, and a Berlin corporation became its successor.

In the early part of 1906, as appears, the defendant decided to wind up its business in France and to cancel so far as it could its outstanding risks in that country. At its request the plaintiff consented to a cancellation of the reinsurance in question, and accordingly on January 19, 1906, it was agreed that the defendant's contract should terminate as of March 13, 1906, which would be precisely three years after its execution. The cancellation was made and accepted—

"subject to losses incurred prior to said date (March 13, 1906) in case they be known and declared afterwards in conformity to the conditions of the contract between the plaintiff and the Brokers' Society."

The defendant received and retained three full premiums for the three years that its reinsurance contract was in force. It appears that the same Berlin company, which had already taken over the share of risk originally reinsured by the Vienna company, became the reinsurer in defendant's place, and for the same annual premium became bound from the date of defendant's retirement for two-tenths of the plaintiff's risk. It also appears that on March 13, 1907, the Brussels company was allowed to withdraw and the plaintiff itself assumed the 2½ per cent. of risk previously carried by that company.

On March 18, or 19, 1907, it was discovered that an employé of one of the members of the Brokers' Society had embezzled large sums from his employer, and had committed suicide. The aggregate amount·of his defalcation was ascertained later to be 669,274.90 francs. Of this sum the employer himself lost one-fourth, which was not insured at all, amounting to 167,318.72 francs, the Brokers' Society lost 250,000 francs, which was not reinsured, and the plaintiff became liable for the balance of 251,956.18 francs.

It was found possible to determine with accuracy the date at which each particular sum had been taken by the dishonest employé, and was therefore ascertained that 301,185.90 francs were embezzled during the three years that defendant was one of the reinsurers, while 368,089 francs were taken between that date and March of the following year. For a time after the defalcation was discovered plaintiff expected to recover a salvage of 35,000 francs, and therefore admitted immediate liability for only 216,956.18 francs, or 32.4166 per cent. of the broker's total loss; and this amount was paid to the Brokers' Society on November 26, 1907.

The method of adjustment with the reinsuring companies which plaintiff adopted was to hold each group of insurers liable as a whole for 32.4166 per cent. of the amount embezzled during the time such group remained unchanged, and then to apportion the sum so ascertained among the insurers in proportion to the share of the risk which each of them had assumed for that period. Thus, the amount embezzled during the time that defendant was one of the insurers was 301,-185.90 francs, and one-fifth of 32.4166 per cent. of that sum is 19,526.-84 francs, which was the amount that plaintiff in the first instance demanded of defendant. The latter denied its liability and refused to make any contribution. The claim for salvage was finally settled by a credit of 15,000 francs, and the Brokers' Society was accordingly paid an additional 20,000 francs on February 19, 1912, which was after the commencement of this suit; and thereupon plaintiff demanded of defendant the further sum of 1,776 francs as its share of this 20,000 francs.

At the close of the trial, upon the facts above summarized, the defendant prayed the court, in substance, to rule that under the true construction of the reinsurance contract between the plaintiff and defendant, and the cancellation agreement afterwards executed by them, the plaintiff was not entitled to recover unless the court sitting as a jury should find that the sums taken by the embezzling employé between March 13, 1903, and March 13, 1906, amounted in the aggregate to more than 333,333 francs. The refusal of the court to grant this prayer is assigned as error, and presents the principal question to be determined.

The plaintiff contends that the uninsured portion of the loss, namely, one-fourth of the total, plus 250,000 francs, should be deducted once for all from the total loss when ascertained, and as of the date of its ascertainment, and that each successive reinsurer should benefit by such deduction in proportion to the amount embezzled during the time it was on the policy. It is argued that the obligation originally assumed by plaintiff to the Brokers' Society was undivided in point of time, that when a loss was discovered the broker's one-fourth was to be determined as of that date, and it was then that the 250,000 francs were to be met by the Brokers' Society, and that such deductions were not and could not be made until the entire loss became known. As the cancellation agreement did not discharge the defendant from liability in any and all events, it still remained bound for losses incurred prior to March 13, 1906, in case they became known and were declared before the expiration of the five-year period covered by plaintiff's policy. From plaintiff's standpoint, therefore, the defendant as to such losses remained liable to the same extent that the company taking its place became liable for losses subsequently occurring, with the same right to share in the benefit of deductions of the amounts for which the broker and the Brokers' Society were liable; and in this connection the fact is emphasized that when its contract was canceled defendant retained the full premiums for the time during which it was on the policy.

As we understand it, the theory advanced is that defendant and the

other reinsurers became in effect parties to the original agreement between plaintiff and the Brokers' Society; that the moneys taken by the employé from time to time during a period of years, until the theft was finally discovered, constitute only one embezzlement; that the dishonest acts cannot be divided in time or legal effect, and are all covered by plaintiff's policy; that the purpose of plaintiff in reinsuring with defendant was to be protected to the extent of one-fifth of any loss that might happen while defendant was on the reinsurance; and that as defendant was a reinsurer for three years of the period during which the successive thefts occurred, and received its proportionate share of the gross premiums for such three years, it should be held liable for its proportionate share of the entire loss afterwards ascertained. Special stress is placed upon the asserted intention of all the parties that plaintiff should be fully reinsured, except as to about 10 per cent. of its undertaking, during the entire period of five years, that when cancellation was permitted in any case another reinsurer was at once to take the place of the one retiring, and that every one concerned acted upon the assumption that the risk assumed by a reinsurer for the last two years was no greater than the risk of the reinsurer for the first three years. And from this reasoning, without amplifying the argument, it is deduced that the entire loss, as it was finally determined, should be distributed in equitable proportions among those who, at one time or another, in varying percentages, had undertaken to protect the plaintiff, to the extent stated, against its admitted liability for the whole sum covered by its policy. This was substantially the view taken by the trial court, and judgment was accordingly ordered for the full amount of the plaintiff's claim. The learned judge in his opinion says:

"The first of the three possible theories of adjusting the loss among successive reinsurers, therefore, seems to have been that which was in contemplation of the parties. It is a perfectly simple and logical theory. It requires nothing further than the assumption that the parties intended that the sum to be borne by the broker himself and by the Brokers' Society should not be deducted until the total loss was ascertained, and then from the total loss. Obviously that is the only time at which the broker's one-fourth could, as against him, be calculated.

"To my mind as applied to the facts of this case, it is far the most equitable of the three possible theories. It contravenes no positive rule of law. So far as I am aware, there is not a single authority opposed to it, although it is equally true that there is none in its favor."

We are constrained to reject this theory for reasons which appear to us convincing. This is an action at law, and the defendant's liability is measured and confined by its written agreement. For aught we can see, many of the facts above recited furnish no aid to the proper construction of that agreement. In other words, the question would remain the same if these facts were eliminated. For example, the defendant had nothing to do with the requirement of the Brokers' Society that plaintiff reinsure nine-tenths of its risk, and nothing to do with the number or choice of reinsurers. Nor are the nature and extent of defendant's undertaking affected by the fact—assuming it to be a fact —that it countersigned the original policy, and thereby or otherwise ac-

cepted its provisions. Independent of any promise to do so, the plaintiff would have been free to reinsure the whole or any part of its risk, and could place such reinsurance with companies of its own selection, and upon such terms as might be agreed upon with them. Furthermore, the fact that another reinsurer was secured when defendant's withdrawal became effective, whether in fulfillment of plaintiff's obligations to the Brokers' Society in that regard or for any other reason, and that such reinsurer took the same percentage of risk and received the same relative share of the gross premium, has no perceptible bearing upon the defendant's liability. To this it may be added that the circumstance that the gross premium paid by the Brokers' Society, or so much of it as was not retained by plaintiff, was divided among the various reinsurers in proportion to the percentage of their several risks is quite immaterial. In short, there was no privity between defendant and the other reinsuring companies, whether those originally bound or those that came in afterwards. True, they all had like contract relations with the plaintiff, but each of them was wholly independent of the others. It results that the liability of defendant does not depend in the least upon the extent to which the Berlin Company became liable, or whether it became liable at all. To state the proposition in another way, we do not perceive that the question presented differs in any respect or degree from the question that would be presented if plaintiff had made exactly the same contract with the defendant, and canceled it on the same conditions, without placing other reinsurance at any time, and without being under obligation to do so.

The controlling facts then are simply these: Plaintiff insured the Brokers' Society for five years from March 13, 1903, against any loss exceeding 250,000 francs, and not more than 1,000,000 francs, for which the latter might be liable to any of its members. The risk thus assumed by the plaintiff, to the extent of one-fifth, was reinsured with defendant for the same period. By written agreement between them this reinsurance was canceled on the 13th of March, 1906, subject to losses incurred prior to that date. No one then knew or suspected that anything had occurred to make the plaintiff liable under the terms of its policy. It turned out afterwards that between March 13, 1903, and March 18 or 19, 1907, and at various times between those dates, a dishonest employé had stolen an aggregate of some 669,000 francs. It was ascertained that about 301,000 francs were taken prior to March 13, 1906, and some 368,000 francs after that date. The entire loss was "known and declared" before the five-year period of insurance expired, and the plaintiff was therefore concededly liable to the Brokers' Society for three-fourths of the entire sum embezzled, less 250,000 francs.

The controversy thus reduces itself to the question of what liability the defendant remained under, when the cancellation of its reinsurance took effect on March 13, 1906, by reason of the fact that such cancellation was "subject to losses incurred prior to said date." To our minds this appears a plain provision, the meaning of which is not obscure or ambiguous. The obvious purpose of the cancellation was to discharge

the defendant from all liability or responsibility for future embezzlements covered by plaintiff's policy. If anything had previously happened for which the plaintiff was then liable to the Brokers' Society, the defendant continued bound to the extent of its indemnity; but if nothing had occurred up to that time for which the plaintiff was obligated, it is certainly difficult to see how anything that afterwards took place could operate to charge the defendant with liability.

To hold that subsequent losses had the effect of imposing an obligation which did not exist when defendant's contract was annulled is to give to the agreement then made a construction which measurably defeats the object of defendant in seeking release from its engagement. The condition or reservation of the cancellation agreement related wholly and by express terms to what had already occurred, and cannot, in our judgment, be fairly construed to cover losses resulting from subsequent thefts. It is conceded that the amount embezzled prior to March 13, 1906, was only about 301,000 francs, and for the loss of that amount the plaintiff was not liable to the Brokers' Society, because such a loss was not covered by its policy. The plaintiff of course was liable for defalcations before as well as after defendant's release, if those losses constituted a single embezzlement and amounted altogether to more than 333,333 francs, but the defendant was bound only for losses prior to March 13, 1906, and that liability could not be increased or affected by thefts thereafter committed. This seems to us the construction required by the language and purpose of the cancellation agreement, and we cannot do otherwise than construe it accordingly.

[2, 3] It was urged in argument, and the point was somewhat dwelt upon by the learned District Judge, that the parties could not have intended by the words they used to decide the present dispute in advance and in favor of defendant. We suggest that it would perhaps be more correct to say that they had no intention at all respecting the matter now in controversy. In other words, this is one of those cases where the parties to a contract failed to provide for a contingency which afterwards happened because at the time the contract was made it did not occur to either of them that such a contingency would or could happen. We must therefore interpret the agreement as it was written, and give to the language employed its natural and commonly understood meaning. Clearly the defendant was a mere surety, and it is well settled that liability in such cases cannot be enlarged by implication. The plaintiff was at liberty to hold the defendant for the full five years of its contract. It could refuse a release altogether or allow it upon conditions which would have bound the defendant to contribute for such a loss as was actually suffered. It saw fit to cancel the defendant's contract of reinsurance on a certain date, subject only to prior losses, and except as to those losses it has no legal claim against the defendant.

Much the same may be said of the contention that the defendant is equitably bound to contribute, in proportion to the time it was on the policy and its percentage of the risk, to the amount which plaintiff has

been compelled to pay, and this view is reflected in the opinion of the learned Judge presiding at the trial. It is true that the defendant received its agreed share of the gross premium for three years, but it carried its share of the risk during that period, and then simply had the good fortune to get released before any loss occurred for which the plaintiff was liable. The result may be that the plaintiff must bear a loss against which it supposed itself protected, but if it inadvertently made a bad bargain, the courts cannot be called upon to save it from the consequences. In a word, we perceive no grounds for deciding the question here presented in accordance with the assumed or asserted equities to which we have referred. In our judgment the plaintiff has no cause of action because it was under no liability to the Brokers' Society at the time of defendant's release, and the latter cannot be held responsible for what afterwards transpired.

It seems fitting to add that the question here involved is mainly one of first impressions. Counsel on both sides concede that no precedent has been found in the reported cases, and our own researches have been equally fruitless. We can only say, after careful consideration, that we are unable to accept the conclusion of the court below, for the reasons above outlined. It follows that the judgment must be reversed, and the case remanded for further proceedings not inconsistent with this opinion.

Reversed.

WOODS, Circuit Judge (dissenting). I am unable to concur in the reasoning and conclusion of the majority opinion, because, in the settlement of the insurance, it gives to the defendant, as a reinsurer as of the date of the cancellation of its policy, the entire benefit of the required deduction of one-fourth of the risk carried by the insured employer and of the 250,000 francs carried by the original insurer, the Brokers' Society, whereas, construing all the contracts together, it seems to me clear that these deductions should be made for the proportionate benefit of all the reinsurers at the date of the ascertainment of the entire loss. Even if the latter construction of the contract be regarded doubtful, it should be preferred, since it produces a fair equality of burden, while giving the defendant the benefit of the entire deductions results in an inequality of burden, which could not have been in contemplation either when the defendant's contract was made or when it was canceled.

Elaboration is not attempted because it would be mere repetition of the full and strong reasoning of the District Judge.