Littueton, Judge,
delivered the opinion of the court:
Plaintiff contends for a judgment of $4,188,913.32 which includes interest of $1,703,107.20 from various dates to June 30, 1935, on $1,121,253.29 of the items making up the total of the principal amount of $2,485,806.12 claimed. In addition, interest is claimed to date of judgment. Kecovery of the amounts mentioned in findings 1 to 27, inclusive, with interest, is based upon alleged failure of the government to observe the stipulations of Art. 13, treaty of June 22, 1855, 11 Stat. 611; Arts. 3, 13, and 46 of the treaty of April 28, 1866, proclaimed July 10,1866,14 Stat. 769, the Atoka agreement of April 23,1897, ratified June 28,1898,30 Stat. 495, and the Supplemental agreement thereto of July 1,1902, 32 Stat. 641, and certain acts of Congress, as well as certain alleged *358 illegal disbursements made by the defendant through the Secretary of the Interior from noninterest- and interest-bearing funds of plaintiff alleged to have been contrary to and in excess of congressional appropriations, and in excess of and contrary to authority contained in such agreements and various acts of Congress, hereinafter mentioned in more detail.
The record discloses a great mass of accounting over a long period of time with respect to the management of affairs of the plaintiff tribe, the handling and disposition of its property and funds derived from such management, disposition, and sale, and the disbursements made from. such funds at various times and for various purposes. From the standpoint of accounting the case is much involved, difficult to analyze, and more difficult to express, but the issues 'between the parties as to the right of plaintiff to recover on any or all of the items involved, and the right of the defendant to offset various gratuitous expenditures, set forth as having been made for the benefit of plaintiff tribe, are governed by certain definite principles-of law which we think have been adjudicated and settled in prior decisions involving the relationship of Indian tribes with the Government, and the plenary power of Congress to legislate with respect to the affairs, property, and funds of the Indian tribes.
The Choctaw and Chickasaw tribes were originally located in the southern section of Mississippi. In 1830 and 1832 the tribes removed pursuant to treaty stipulations to the Indian Territory, and there occupied jointly land ceded to them by the United States in lieu of the Mississippi lands. In a treaty of 1855 between the United States and these tribes, their reservation in the Indian Territory was definitely separated; the Choctaws occupied an assigned portion, and the Chickasaws their portion. In 1866 and subsequently, other treaties and agreements were entered into between plaintiff and the United States, and certain acts of Congress were enacted with reference to the tribal property and funds of plaintiff, under all of which the claims here involved arose. The pertinent provisions of these treaties, agreements, and acts of Congress will be hereinafter mentioned in *359 connection with a discussion of the various items of the claims herein made by the plaintiff.
Prior to the Atoka agreement dated April 23, 1897, ratified and incorporated as section 29 of the Curtis Act of June 28, 1898, 30 Stat. 495, the tribal property of plaintiff was held in common by the tribe under a patent issued therefor by the United States to the Tribal Government. Plaintiff also, with- the recognition and approval of the United States, maintained its own government, enacted its own laws not inconsistent with the treaty provisions and acts of Congress, and, subject to the approval of the United States, managed its own affairs and disbursed its own funds. In 1893, due to the unsatisfactory manner in which the tribal government was being maintained and operated, the fact that white people who had moved on the reservation outnumbered the Indians 5 to 1, and whom the tribal government had not removed or requested the United States to remove, and the fact that the rights and interests of the members of the tribe in and to the common property and funds were not being properly protected and managed, Congress by section 16 of the act of March 3, 1893, 27 Stat. 612, 645, authorized the' President to appoint a commission to enter into negotiations with the Five Civilized Tribes for the purpose of extinguishment of the national or tribal title to any lands then held by any or all such nations or tribes either by cession of the same, or some part thereof, to the United States for disposition for the benefit of the Indians, or by allotment and division of same in severalty among the Indians of such nations and tribes, respectively, as might be entitled to the same, or by such other method as might be agreed upon between the several nations and tribes, or each of them, with the United States, with a view to such an adjustment upon the basis of justice and equity as might, with the consent of such nation or tribe so far as might be necessary, be requisite and suitable to enable the ultimate creation of a state or states of the Union to embrace the lands within the Indian Territory. The Commission commonly styled the “Dawes Commission” was appointed and,’ in May 1894 and subsequently, made reports which are *360 quoted at length in Stephens v. Cherokee Nation, 174 U. S. 445, 447, 453, disclosing the existence of the conditions heretofore mentioned, and others. By the act of June 10, 1896, 29 Stat. 321, 339, Congress directed the Commission “to continue the exercise of the authority already conferred upon them by law, and endeavor to accomplish the objects heretofore prescribed to them * *
Pursuant to the direction of Congress and the authority conferred upon it, the Dawes Commission continued negotiations, and, on April 23, 1897, arrived at an agreement known as the “Atoka agreement” with plaintiff tribe, which, as amended by Congress, was ratified by section 29 of the act of June 28, 1898, 30 Stat. 495, commonly known as the “Curtis Act,” entitled “An Act for the protection of the people of the Indian Territory, and for other purposes.” The agreement, as amended, was accepted by a vote of the members of the Choctaw Tribe at an election held for that purpose. The whole purpose of this agreement and the Supplemental agreement of 1902, 32 Stat. 641, subsequently made, and the purposes designed and intended to be accomplished thereby, were for the United States government to take over the management, control, and administration of the property, affairs, and funds of the tribe or nation theretofore exercised by the tribal government, to continue the tribal government only for limited purposes, and to administer and dispose of the property and funds of the Indians for their benefit. In view of existing conditions, all of this could have been accomplished by an act of Congress. Lone Wolf v. Hitchcock, 187 U. S. 553; Choate v. Trapp, 224 U. S. 665. To this end, and in order that a state or states might be created in the Indian Territory, the Atoka and Supplemental agreements contained many provisions as to the manner in which the lands and other property of the tribe should be handled and disposed of under the supervision and control of the government of the United States for the benefit <of the Indians. The Atoka and Supplemental agreements provided for the allotment of certain of the lands to members of the tribe, the reservation from allotment of other lands, including coal and asphalt lands; for the surveying, platting, and selling of certain town sites and town lots, and *361 tbe disposition of the proceeds from town lots per capita to members of the tribe. These agreements contained a number of other detailed provisions designed to effect and carry out the many purposes intended to be accomplished, among which were the following: Surveying, platting, grading, and appraising lands for allotment; allotting lands to individual Indians of the tribe; surveying, platting, appraising, and disposing of town sites and town lots; settling of all controversies between members of the tribe as to their right to have certain lands allotted to them; the placing of each allottee in possession of his allotment, and the removal of all persons therefrom objectionable to the allottee; surveying, marking, and locating the 98th meridian of west longitude between Red and Canadian Rivers before allotment of lands should begin; providing proper records of land titles; collecting of all revenue from coal and asphalt lands; per capita payments through a bonded officer of the United States; paying of money from the sale of town lots therein specified into the treasury, and the disposition thereof at the end of each year to the tribe, each member receiving an equal portion thereof. After making provision with reference to town sites, and the appraisal and sale of town lots, 30 Stat. 495, 508, 509, the Atoka agreement provided that all payments from the sale of town lots as therein provided should be paid into the Treasury of the United States, and that the money so paid into the Treasury “shall be for the benefit of the members of the Choctaw and Chickasaw tribes (freedmen excepted), and at the end of one year from the ratification of this agreement, and at the end of each year thereafter, the funds so accumulated shall be divided and paid to the Choctaws and Chickasaws (freedmen excepted), each member of the two tribes to receive an equal portion thereof.” Then followed, in this agreement, this provision: “That no charge or claim shall be made against the Choctaw or Chickasaw tribes by the United States for the expenses of surveying and platting the lands and town sites, or for grading, appraising, and allotting the lands, or for appraising and disposing of the town lots as herein provided.” The Atoka agreement contained no other provision by which the United States specifically agreed to assume and pay *362 expenses incident to the management, control, and disposition of the affairs and property of the tribe as provided for in the agreement, and as subsequently directed from time to time by Congress.
The Supplemental agreement of 1902, 32 Stat. 641, 649-51, contained no provision under which the United States specifically assumed any obligation to bear the expense incident to the management, control, and disposition of the property and funds of plaintiff tribe. This agreement provided for allotments to members of the tribe; the sale of unallotted lands; the placing by United States Indian agents of each allottee in possession of his allotment, and the removal of objectionable persons therefrom; the compilation of rolls of citizens; the creation of a Citizenship Court, and the payment by the United States of the salaries and traveling expenses of the judges, as well as the salaries of clerks; the making of a roll of Chickasaw freedmen, and allotments of 40 acres to each; ascertainment of lands valuable for coal, and the setting aside thereof for the common benefit of members of the tribe; disposition of the proceeds from sale of coal lands per capita; the recording of patents without expense to allottee or grantee, and the payment to each citizen of the nation $40 per capita, after the approval of his patent.
This Supplemental agreement provided that the unallotted lands “shall be sold at public auction under such rules and regulations, and on terms to be prescribed by the Secretary of the Interior, and so much of the proceeds as may be necessary for equalizing allotments shall be used for that purpose, and the balance shall be paid into the Treasury of the United States tu the credit of the Choctaws and Chickasaws, and' distributed per capita as other funds of the tribes.”
With reference to the sale of unallotted coal and asphalt lands and deposits, this agreement provided that “the proceeds * * * shall be deposited in the Treasury of the United States to the credit of said tribes and paid out per capita to the members of said tribes (freedmen excepted) with the other moneys belonging to said tribes in the manner provided by law.”
*363 The first item of plaintiff’s claim (finding 1) arises under Arts. 3 and 46 of the treaty dated April 28, 1866, ratified July 10, 1866, 14 Stat. 769.
Under this item plaintiff seeks to recover $286,142.18, of which $79,082.87 is alleged to be due as principal in connection with the transaction disclosed by the finding and $207,-059.31 is interest at 5 percent thereon from May 21, 1883, to June 30, 1935. In addition the right to interest on the $79,082.87 is asserted to date of judgment.
The Choctaws and Chickasaws owned slaves and when the Civil War broke out both tribes joined the Confederacy. The treaty of 1866 accomplished, among other things, the restoration of amicable relations between the Indians and the government, reaffirmed their title to their landed estates and, of importance to the items now being considered, provided for the acquisition by the government of what is known as the “Leased District,” a portion of the Indian reservation. This treaty contained express provision for taking care of the former slaves, i. e., freedmen. . Arts. 3 and 46 of this treaty (14 Stat. 769) are as follows:
ART. 3. The Choctaws and Chickasaws, in consideration of the sum of three hundred thousand dollars, hereby cede to the United States the territory west of the 98° west longitude, known as the leased district, provided that the said sum shall be invested and held by the United States, at an interest not less, than five percent, in trust for the said, nations, until the legislatures of the Choctaw and Chickasaw nations respectively shall have made such laws, rules, and regulations as may be necessary to give all persons of African descent, resident in the said nations at the date of the treaty of Fort Smith, and their descendants, heretofore held in slavery among said nations, all the rights, privileges, and immunities, including the right of suffrage, of citizens of said nations, except in the annuities, moneys, and public domain claimed by, or belonging to, said nations respectively; and also to give to such persons who were residents as aforesaid, and their descendants, forty acres each of the land of said nations on the same terms as the Choctaws and Chickasaws, to be selected on the survey of said land, after the Choctaws and Chickasaws and Kansas Indians have made their selections as herein provided; and immediately on the *364 enactment of such, laws, rules, and regulations, the. said sum of three hundred thousand dollars shall be paid to the said Choctaw and Chickasaw nations in the proportion of three-fourths to the former and one-fourth to the latter, — less such sum, at the rate of one hundred dollars per capita, as shall be sufficient to pay such persons of African descent before referred to' as within ninety days after the passage of such laws, rules, and regulations shall elect to remove and actually remove from the said nations respectively. And should the said laws, rules, and regulations not be made by the legislatures of the said nations respectively, within two years from the ratification of this treaty, then the said sum of three hundred thousand dollars shall cease to be held in1 trust for the said Choctaw and Chickasaw nations, and be held for the use and benefit of such of said persons of African descent as the United States shall remove from the said territory in such manner as the United States shall deem proper, — the United States agreeing, within ninety days from the expiration of the said two years, to remove from said nations all such persons of African descent as may be willing to remove; those remaining or returning after having been removed from said nations to have no benefit of said sum of three hundred thousand dollars, or any part thereof, but shall be upon the same footing as other citizens of the United States in the said nations.
Art. 46. Of the moneys stipulated to be paid to the Choctaws and Chickasaws under this treaty for the cession of the leased district, and the admission of the Kansas Indians among them, the sum of one hundred and fifty thousand dollars shall be advanced and paid to the Choctaws, and fifty thousand dollars to the Chickasaws, through their respective treasurers, as soon as practicable after the ratification of this treaty, to be repaid out of said moneys or any .other moneys of said nations in the hands of the United States; the residue, not affected Toy a/ny provision of this treaty, to remaim, in the Treaswry of the United States at an annual interest of not less than ftoe percent, no part of which shall be paid out as annuity, but shall be annually paid to the treasurer of said nations, respectively, to be regularly and judiciously applied, under the direction gf their respective legislative councils, to the support of their government, the purposes of education, and such other objects as may be best calculated to promote and advance the welfare and happiness of said nations and their people respectively. [Italics ours.]
*365 From the standpoint of law and fact, we think this claim is without merit. In purchasing the “Leased District” the government was concerned with providing for the freedmen. The trust fund of $300,000 was essentially contingent. The creation of the trust as well as the right to interest thereon depended upon the adoption by the Indians of their freedmen within the time specified. The plaintiff not only declined to adopt the freedmen within the two years provided but, at first, refused to do so. It was decidedly adverse to their adoption. It was the act of plaintiff which, according to the treaty, “caused the sum to be held in trust,” and it seems clear, therefore, that this particular trust provision of the treaty was ineffective. Evidently anticipating the observance of the treaty, the government appropriated and paid the stipulated rate of interest for two years upon the advancement of $150,000 made to plaintiff under Art. 46 of the treaty. As was held in United States v. The Choctaw Nation et al. (38 C. Cls. 558, affirmed 193 U. S. 115, 126), “The treaty was not complied with either by the Indians or the United States.” In view of this situation Congress enacted the acts of July 26, 1866 (14 Stat. 255, 259), April 10, 1869 (16 Stat. 13, 39), and March 3, 1885 (23 Stat. 362, 366), which in our opinion dispose of the controversy adverse to plaintiff’s contention. Under the acts of July 1866 and April 1869, supra, the total sum of $22,000 was paid to plaintiff as the amount of interest for 1867 and 1868 on the principal sum of $225,000 notwithstanding the principal sum had been reduced to $75,000 as a result of the advance payment of $150,000 made in accordance with Art. 46 of the treaty. Consequently, when the plaintiff did adopt the freedmen in 1883 and Congress provided for the settlement of the balance due plaintiff under the treaty, credit was taken by the defendant for the overpayment of interest for 1867 and 1868. In appropriating for interest, the acts provided only for the payment of interest which was due and as no interest was due on the amount of $150,000 immediately paid, credit therefor was properly taken. The act of. March 3, 1885, 23 Stat. supra, making an appropriation to settle in full plaintiff’s claim growing out of Arts. 3 and 46 of the treaty took credit of overpayments on account of interest. It was in accordance with this legislation that the *366 account, as stated in finding 1, was made. See Chippewa Indians of Minnesota v. United States, 88 C. Cls. 1, affirmed 307 U. S. 1. The advancement of $160,000 made under Art. 46 of -the treaty of 1866 was to be repaid out of any money of the tribe in the hands of the government and, as Art. 3 of the treaty was complied with, the advancement was to become a credit upon the sum of $226,000 due plaintiff. If not complied with “the residue, not affected by any provision of this treaty, to remain in the Treasury of the United States at an annual interest of not less than five percent.” This article contemplated the conditions which subsequently arose, namely, a contest between the Indians and their freedmen, and upon the basis of same the government under legislation settled it.
The next claim made by plaintiff is for a total of $789,773.17, made up of various items as follows:
1. Expenses of sale of unallotted land-$230, 074. 66
2. Expenses of sale of segregated coal and asphalt land— 103,223. 64
3. Expenses of making per capita payments- 126, 805. 31
4. Expenses of appraising improvements- 4,249. 07
5. Pay of miscellaneous employees- 67,542.20
6. Miscellaneous agency expenses- 877.95
7. Expenses for roads- 9,202.35
8. Investigating tribal warrants and claims- 5, 516.19
9. Pay of Indian police_ 8, 591. 74
10. Expenses of sale of tribal buildings- 251. 82
11. Insurance on Choctaw capítol- 138. 00
12. Expenses of monument to Green McCurtain- 500. 00
13. Payments in lieu of allotments_ 137, 579/00
14. Expenses of making equalization payments- 201.56
15. Expenses of medical attention- 1, 089. 60.
16. Expenses of investigating coal and asphalt deposits— 38,416. 27
17. Expenses of office of supervisor of mines_ 5,439.44
18. Expenses óf Choctaw-Chickasaw Sanitorium:
a. Insurance- 8,186.68
b. Pay of miscellaneous employees- 297.25
c. Roads and grounds- 3, 633.79
19. Expenses of appraising timber- 22, 499.33
20. Expenses of sale of town lots (Sec. 7, Act of May 29, 1908, 35 Stat. 444)_ 15,457.32
In support of this claim plaintiff contends that the defendant was obligated to bear all expenses incident to the carrying out of the provisions of the Atoka and Supplemental *367 agreements and that any disbursement made from plaintiff’s funds for that purpose was illegal and must be refunded.
In the alternative plaintiff claims that if the court decides that the defendant did not obligate itself to bear the expenses incident to carrying out the Atoka and Supplemental agreements and that such expenses were properly and legally disbursed and charged to plaintiff’s funds, it is nevertheless entitled to recover $469,921.18 made up of certain of the items above mentioned totaling $67,157.47 alleged to have been disbursed in violation of the provisions of these agreements, $192,608.60 for some of the above-mentioned items and others alleged to have been disbursed in the management and administration of the affairs of the property of plaintiff without appropriation or authority of Congress, and $210,155.11 alleged to have been disbursed in the management of plaintiff’s affairs, and in the administration and disposition of its property in excess of congressional appropriations and authority.
The Atoka and Supplemental agreements were consummated for the purpose, among other things, of allotting to members of the tribe the surface of certain lands, the selling of the unallotted lands, and an equal per capita division of the proceeds realized from sales. Section. 11 of the Supplemental agreement of 1902, 32 Stat. 641, 642, provided as follows:
There shall be allotted to each member of the Choctaw and Chickasaw tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to three hundred and twenty acres of the average allottable land of the Choctaw and Chickasaw nations, and to each Choctaw and Chickasaw freedman, as soon as practicable after the approval by the Secretary of the Interior of his enrollment, land equal in value to forty acres of the average allotable land of the Choctaw and Chickasaw nations; * * *.
The first item of plaintiff’s claim now under consideration (finding 2) is for $230,074.66 alleged to have been illegally disbursed from plaintiff’s funds for payment of expenses of sale of unallotted land, the contention of plaintiff being, as hereinbefore stated, that all such expenses were obligations to be borne by the United States. This contention of plain *368 tiff, which is applicable to all other items claimed by plaintiff to have been disbursed by the defendant from plaintiff’s funds in carrying out the provisions of the Atoka and Supplemental agreements, except certain items claimed to have been otherwise in violation of the agreements, without authority of Congress or in excess of congressional appropriation, is predicated upon the provision in the Atoka agreement of 1897 “That no charge or claim shall be made against the Choctaw or Chickasaw tribes by the United States for the expenses of surveying and platting the lands and town sites, or for grading, appraising, and allotting the lands, or for appraising and disposing of the town lots as herein provided.” 30 Stat. 495,509.
The Atoka agreement provided for the allotment of land but did not provide for the sale or disposition of the unallot-ted lands. This was provided for in the Supplemental agreement. The Atoka agreement did provide for the sale of town lots therein specified and imposed the expense of their sale upon the government. All expenses incident to the sale of town lots surveyed and platted under the Atoka agreement were paid by the United States and are not in controversy here. (The expenses totaling $15,457.32, item 20 above, and sought to be recovered by plaintiff, related to town sites and town lots subsequently platted, surveyed, and sold pursuant to provisions of a subsequent act of Congress, and will be considered later.) Tailing the above-quoted provision in the Atoka agreement respecting the sale of town lots as a premise, plaintiff contends that, notwithstanding the absence of any provision in the Atoka or Supplemental agreement charging the government with the expense of sale of the unallotted lands and other expenses incident to carrying out the provisions of these agreements, it is manifest that Congress intended to charge the government with all these expenses. This contention is an unusual one and becomes, we think, untenable in view of the course of legislation involving proceedings and matters of this precise character. When the government assumes the expenses involved in the management, control, and disposition of property .of an Indian tribe, it generally provides for so doing, and we cannot infer a liability in this regard where the legislation concerned with *369 the subject-matter deals specifically with the- details of procedure and makes no mention of such an assumed liability. See the acts of March 3, 1911, 36 Stat. 1058, and June 30, 1913, section 19, 38 Stat. 71, 96. In legislation enacted soon after the ratification of these agreements, with reference, among other things, to the sale of segregated lands under the Supplemental agreement, it expressly charged plaintiff with the expense thereof. See acts of April 21, 1904, 33 Stat. 189, 209, and of February 19,1912, 37 Stat. 67, 70.
As hereinbefore stated, the Atoka and Supplemental agreements, after specifying in detail the matters to be accomplished thereunder, provided simply, except as to town sites and town lots therein provided for, that “the proceeds” should be deposited in the Treasury and distributed per capita. Nothing specifically was said as to whether the term “proceeds” meant gross proceeds or the proceeds less the cost of sale. Neither was anything said in the agreements with reference to who should bear the expense of administering the other provisions of such agreements. In the first place we think it is obvious that the term “proceeds” as used in the agreements means, and was intended to mean, the amount of money produced less the expenses of sale. This is the ordinary meaning usually applied to the term in agreements of this kind where there is nothing to clearly indicate a contrary intention. In re: Dickson, 166 Pa. 134, 30 Atl. 1032, 1035; Wheeler & Wilson Mfg. Co. v. Winnett (Neb.), 91 N. W. 514. In re: Curtis’ Will, 16 N. Y. Supp. 180, Hun. 372; Armour Packing Co. v. London, 53 So. Car. 539; 31 S. E. 500, 502; Daly v. Crawford (Mass.), 181 N. E. 396, 398; Roosevelt’s Estate, 228 N. Y. Supp., 323, 326; 131 Misc. 800. In Church v. Hubbart, 2 Cranch 187, it was held that words in a contract which admit of a more extensive or more restricted signification must be taken in that sense which is required by the subject-matter and will best effectuate what it is reasonable to suppose was the real intention of the parties. It is the duty of the court, in order to decide upon the meaning of a written instrument, to look not only to the language employed but to the subject-matter and the surrounding circumstances. In Sacramento Navigation Co. v. Sale, 273 U. S. 326, it was held that a contract includes not *370 only tlie promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it is made. Smith v. Bell, 6 Pet. 68; Nash v. Towne, 5 Wall. 689; Chicago, Rode Island and Pacifio Ry. Co. v. Denver and Rio Grande R. R. Co., 143 U. S. 596. The intent of the contract must be deduced from the entire instrument, from its subject-matter, from the purpose of its execution, and the circumstances of the parties when they made it must prevail over any careless recitals therein, unless the intent so gathered runs counter to the plain sense of the binding words of the agreement. U. S. Fidelity & Guaranty Co. v. Board of Woodson County, Kan., 145 Fed. 144; Hawkeye Commercial Men's Ass'n v. Christy, 294 Fed. 208; U. S. Fidelity & Guaranty Co. v. French Mut. Gen. Society of Mut. Ins. against Theft, 212 Fed. 620; Knowlton v. Oliver, 28 Fed. 516.
Plaintiff contends that any doubt as to whether the plaintiff or the government was to bear the expenses of administering the agreements and the expenses of sale of the unallotted lands and the coal and asphalt lands and deposits, such doubt should be resolved in favor of plaintiff and the defendant held to have assumed such obligations. But this contention, in view of the circumstances and the purposes which brought about the execution of the agreements and the purposes intended to be .accomplished thereby, does not help the plaintiff here. In Carpenter el al. v. Shaw, 280 U. S. 363, 365, it was held that while the language used in Indian treaties should never be construed to the prejudice of the Indians, words used therein should be considered as having been used according to their plain import as connected with the tenor of the treaty, and in Blackfeet, et al. Tribes of Indians v. United States, 81 C. Cls. 101, this court held that the rule as to construction of treaties with the Indians most favorable to the Indians does not extend to the point of permitting the court to indulge in presumptions and implications of assumed obligations by the government where the attendant facts and circumstances clearly negative any intention upon the part of the government to assume such obligations.
*371 In tbe second place the government was deriving no pecuniary benefit under the agreements. No monetary consideration passed thereunder from the government to the Indians or from the Indians to the government. ■ There was no cession by plaintiff of any property to the government, nor was there any surrender by plaintiff of any rights to the property which it owned or to the proceeds from any disposition thereof. The gross proceeds and revenue derived by plaintiff under the Atoka agreements and from royalties and revenue were at least $24,800,000. If the agreements had been drawn so as to provide in all respects as they did, except that the affairs of the tribe should be managed, and its property controlled and disposed of in accordance with the terms agreed upon by the tribal government instead of the United States, it would be too clear for argument that the United States, at whose instance the agreements were brought about as being for the best interests of the entire tribe, would not be obligated to bear any of the expenses. We think it is equally clear, when the agreements are interpreted in the light of their purpose due to existing conditions, that the assumption by the United States of control of the administration of the affairs of the tribe and the carrying out of the agreements did not impose upon it the obligation of paying all the expenses incident thereto. No instance in the history of Indian policy of the government is cited, and we find none, to show that the United States has, as a general policy, borne the expense of the distribution or sale of tribal property.
For these reasons we hold that the United States was not obligated under the agreements to bear the expenses incident to carrying out the provisions of the agreements and that the plaintiff is not entitled to recover the amounts herein claimed which were disbursed by the defendant from plaintiff’s funds for such purposes. This disposes of all the amounts asserted under the claim of plaintiff for $789,773.17, except such of the amounts as are stated in the alternative claim of $469,-921.18. The items of this alternative claim will be considered in the order of the findings.
Plaintiff first asserts under its alternative claim that for the fiscal years 1913 to 1929, inclusive, the amount of $68,- *372 165.03 was disbursed from its funds (finding 3) for expenses of sale of unallotted lands in excess of congressional appropriations and is recoverable under the proviso in the Indian appropriation act of August 24, 1912, 37 Stat. 518, 531, which provided that during the fiscal year ending June 30, 1913, no moneys should be expended from the tribal funds belonging to the Five Civilized Tribes without specific appropriation by Congress, except for equalization of allotments per capita and other payments authorized by law to individual members of the respective tribes, tribal and other Indian schools for the current fiscal year under existing law, salaries and contingent expenses of governors, chiefs, assistant chiefs, secretaries, interpreters, and mining trustees of the tribes for the current fiscal year and attorneys for said tribes employed by contract approved by the President, under existing law, for the current fiscal year. The facts show that.the amount disbursed from plaintiff’s funds for the purposes mentioned in excess of congressional authority or appropriation subsequent to the fiscal year ending June 30, 1913, was only $8,424.47. Under the rule announced in Creek Nation v. United States, 78 C. Cls. 474, plaintiff would be entitled to judgment for this amount of $8,424.47 if it were not for the provisions of the act of August 12, 1935, 49 Stat. 571, which provided, at page 596, that in all suits then pending in this Court by any Indian tribe which had not been tried or submitted and in any suit thereafter filed the court should consider and offset against any amount found due the tribe all sums expended gratuitously by the United States for the benefit of the tribe. The act contained a proviso to the effect that expenditures made prior to the date of the law, treaty, agreement, or Act of Congress under which the claim arose should not be offset against the claim or claims asserted by the tribe, and a further proviso that fluids appropriated and expended from tribal funds should not be construed as gratuities. The jurisdictional act in the Greek case contained no provision for offsetting disbursements made in the administration of Indian affairs for expenses or purposes for which the United States was not liable or obligated under a treaty or agreement to bear, and which disbursements were for the *373 benefit of the Indian tribe concerned. The item of $8,424.47 here in question was a disbursement for the benefit of plaintiff under our holding that the government was not obligated to bear the expense of administering the Atoka and Supplemental agreements. If judgment is entered for plaintiff for this item, the same would be a gratuitous payment out of public funds to plaintiff tribe for an expense which the United States was not obligated to bear, and since it was solely for plaintiff’s benefit the same would, therefore, be a proper offset under the act of 1935, supra. In these circumstances plaintiff is not entitled to judgment. Congress possesses and has long exercised in many cases the authority to charge Indian tribes with disbursements for their benefit which may .be a charge against public funds, for which disbursement the government has not by treaty or agreement assumed responsibility. In some cases reimbursable appropriations are made; in others expenditures are made charges against any amount recovered by suit. In effect, therefore, the provision of the act of 1935 requiring the court to offset sums gratuitouly expended for the benefit of a tribe is a ratification of the disbursements made by the Secretary of the Interior from tribal funds for proper purposes and for the benefit of the tribe which may have been in excess of congressional appropriation; Crozier v. Krupp, 224 U. S. 290, 305. Certain of the claims here made by plaintiff are for sums disbursed from its funds without appropriation, and solely on that account. The second proviso in the 1935 act to the effect that funds appropriated and expended from tribal funds shall not be considered as gratuities does not, therefore, affect the rule above announced, for the reason that the purpose of this proviso was to make clear that the appropriation and expenditure of tribal funds pursuant to the power of Congress over the affairs and property of Indian tribes should not give rise to any charge against the Indians because of the exercise of such power. In other words, if a tribe is held entitled to recover a sum by reason of failure of the government to fulfill an obligation on which it is liable, such recovery shall not be offset by any amount appropriated and expended from tribal funds. Compare Lone Wolf v. Hitchcock, 187 U. S. 553, *374 583; Chippewa Indians of Minnesota v. United States, 88 C. Cls. 1, affd. 307 U. S. 1; Chickasaw Nation v. United States, 87 C. Cls. 91. Plaintiff contends that the offset statute of 1935 is unconstitutional on the grounds that it is retroactive, deprives plaintiff of vested rights, and takes from the court its power to administer justice between the parties. We think these contentions are without merit for the reasons hereinafter given in discussing the act of 1935 with reference to offsets for gratuitous expenditures.
The next item of the claim for $68,165.03 (finding 3) is not allowable for the reasons as hereinbefore held that the Atoka and Supplemental agreements did not impose any obligation upon the United States to bear the expense of tiheir administration. The facts show that the amount mentioned in this finding was expended from plaintiff’s funds pursuant to congressional authorization.
Under the facts set forth in finding 4, plaintiff makes claim for $119,294.25 which was expended by the Secretary of the Interior from plaintiff’s funds for educational purposes for the benefit of plaintiff tribe in certain years between 1913 and 1929 in excess of the amounts specified in the acts of April 26, 1906, and March 7, 1928, mentioned in the finding. Plaintiff is not entitled to judgment for this amount for the reasons above stated with respect to the claim in finding 2 as to the excess disbursement by the Secretary from plaintiff’s funds for a purpose which was for its benefit.
The amount here involved was disbursed for an authorized purpose but in excess of the limitation fixed and if judgment were entered for plaintiff for the excess claimed, the same would have to be offset by a like amount under the act of 1935.
The next item claimed by plaintiff (finding 5) is for $58,887.07, representing the total disbursements made by the Secretary during the years 1917 to 1919, inclusive, and 1922 to 1924, inclusive, from plaintiff’s funds for its benefit covering the expenses incident to making per capita payments under the Atoka and Supplemental agreements in excess of the amounts appropriated and authorized to be expended for that purpose from plaintiff’s funds. Since *375 this disbursement was for the benefit of plaintiff tribe, it would, if judgment were entered therefor, be offset under the act of 1935 by a like amount. Plaintiff is therefore not entitled to a recovery on this item.
The next claim of plaintiff is for $4,249.07 (finding 6), being the amount disbursed from plaintiff’s funds during the fiscal years 1904 and 1905 for expenses in appraising improvements which had been placed upon lands of plaintiff prior to the segregation thereof under the authority of the act of July 1, 1902, ratifying the Supplemental agreement. Section 58 of that act, provided that all the lands of plaintiff classified as containing coal and asphalt • deposits should be segregated and reserved from allotment to the Indians. This act also provided that the improvements, of any member or freedman existing upon any of the lands so segregated and reserved at the time of their segregation and reservation, should be appraised under the direction of the Secretary and should “be paid for out of any common funds of the two tribes in the Treasury of the United States, upon the order of the Secretary * *
The act of 1902 contained no provision imposing the cost of appraisement upon the government and the only question is whether the Secretary had implied authority to make the disbursements covering the cost of making such appraise-ments. We think he did. It was impossible properly to administer the provisions of the agreement ratified by the act of July 1,1902, without an appraisement of the lands and improvements, and it was for the benefit of the Indians that appraisement should be made. Inasmuch, therefore, as provision was made by statute for paying for appraisements out of plaintiff’s funds, we think it follows that the cost of completing the transaction under the agreement was to be borne by plaintiff. The Secretary clearly had implied authority to pay this expense out of plaintiff’s funds.
The next item of plaintiff’s claim is for $68,420.45, made up of amounts of $67,542.20 for pay of miscellaneous employees and $877.95 for miscellaneous agents’ expense (finding 7). The facts show that $65,899.96 was expended during 1905 to 1912, inclusive, from plaintiff’s funds for its benefit to cover *376 expenses of miscellaneous employees and miscellaneous agents’ expenses, and the amount of $2,520.49 was expended for the same purposes during 1913 and 1919.
Plaintiff contends that these expenses come within the purview of annual appropriation acts making appropriations from public funds for the operation of the Interior Department, and that the cost of Indian agencies, payment of Indian agency employees, and other agency expenses are purely administrative expenses of the Interior Department for which the government is responsible and for which no charge should be made against the Indian tribe. In Creek Nation v. United States, 78 C. Cls. 474, 490, we held that the Curtis Act, which took away from the Indian authorities the control which they formerly exercised over tribal property and funds, by clear and necessary implication vested the Secretary of the Interior with authority “to disburse and expend the funds in such manner and for such purposes as would, in his judgment, satisfy the needs” of the Indians. The decision in that case precludes recovery of the item of $65,899.96 for 1905 to 1913. In any event, this amount, if allowable, would be offset by a like amount under the Act of August 12, 1935, 49 Stat. 571, 596, since it was expended for the benefit of the plaintiff tribe. The balance of $2,520.49 was expended for the benefit of plaintiff tribe for miscellaneous employees and agency expenses subsequent to the fiscal year beginning July 1, 1912, without specific congressional appropriation. In these circumstances the amount would, if allowed, be offset by a like amount required under the act of 1935. Blackfeet et al. Tribes of Indians v. United States, 81 C. Cls. 101; Crow Tribe v. United States, 81 C. Cls. 238; Shoshone Tribe of Indians v. United States, 82 C. Cls. 23, 55-59, 93, 94; Eastern or Emigrant Cherokees v. United States, 82 C. Cls. 180; Klamath et al. Tribes v. United States, 85 C. Cls. 451. We find no language in Article 13 of thet treaty, of September 27, 1830, 7 Stat. 333, or the treaty of 1855, under which the defendant obligated itself to bear this expense.
The next item of plaintiff’s claim is for $9,202.35 disbursed from plaintiff’s funds for roads (finding 8). It is contended that this was an expense which the government was obligated to bear in the administration of the Atoka and Supplemental *377 agreements. For the reasons hereinbefore stated, under this phase of the case,- this contention cannot be sustained. The amount was disbursed pursuant to authority of the acts of April 26, 1906, and March 7,1928. Plaintiff is therefore not entitled to recover.
Plaintiff next seeks to recover $5,516.19 (finding 9), representing disbursements made from its funds for its benefit for investigating tribal warrants and claims, on the ground that the Atoka and Supplemental agreements ended the tribal authority and .that, under those agreements, this expense was an obligation of the United States. This contention cannot be sustained for the reason that the Secretary had implied authority to incur and pay the expenses. Moreover, section 11 of the act of April 26,1906, 34 Stat. 137, 141, provided in part as follows:
That all revenues of whatever character accruing to the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes, whether before or after dissolution of the tribal governments, shall, after the approval hereof, be collected by an officer appointed by the Secretary of the Interior under rules and regulations to be prescribed by him; and he shall cause to be paid all lawful claims against said tribes which may have been contracted after July first, nineteen hundred and two, or for which warrants had been regularly issued, such payments to be made from any funds in the United States Treasury belonging to said tribes. All such claims arising before dissolution of the tribal governments shall be presented to the Secretary of the Interior within six months after such dissolution, and he shall make all rules and regulations necessary to carry this provision into effect and shall pay all expenses incident to the investigation of the validity of such claims or indebtedness out of the tribal funds; * * *
The next claim of plaintiff is for $8,591.74 disbursed from its funds for pay of Indian police (finding 10). This amount was disbursed by the Secretary from plaintiff’s funds during the years 1910 to 1913, inclusive, for a purpose which was for the benefit of plaintiff tribe but without specific appropriation by Congress. The amount of $7,311.49 was disbursed for the purpose mentioned prior to the fiscal year beginning July 1,1912, which was prior to the provisa contained on page 531 of the Indian Appropriation Act of August 24, *378 1912, 37 Stat. 518, that no money should be expended from tribal funds without specific appropriation by Congress, except for certain purposes. And $1,280.25 was disbursed from plaintiff’s funds during the fiscal year 1913 for a like purpose but without appropriation or specific authority of Congress. As to the amount of $7,311.49, we think the Secretary possessed implied authority under the rule announced in the Greek case to make the disbursement in connection with the administration and handling of the property and affairs of plaintiff. In any event, this amount and also the balance'of $1,280.25 disbursed in 1913 would, since they were for a purpose beneficial to the tribe, constitute an offset under the act of 1935. Plaintiff is therefore not entitled to judgment on this item.
The next item of plaintiff’s claim is for $251.82 (finding 11) which represents the amount disbursed by defendant from plaintiff’s funds for the expense incident to sale of certain tribal buildings. Plaintiff bases its claim upon the ground that this was an expense which the defendant was obligated to bear under the Atoka and Supplemental agreements. In view of our conclusion that defendant did not in these agreements assume the expenses incident to their administration and the winding up of the affairs of the tribal government, plaintiff is not entitled to recover. This disbursement was authorized under section 15 of the act of April 26, 1906 (34 Stat. 137, 143) and the act of April 30, 1908 (35 Stat. 70, 71).
The next item for $138 (finding 12) represents disbursements for plaintiff’s benefit to1 cover insurance premiums of plaintiff’s Capitol building. Although this expenditure was not specifically appropriated by Congress, we think the Secretary had implied authority under the Atoka and Supplemental agreements to make the disbursement which was solely in the interest of plaintiff and for the purpose of conserving and protecting its property. Creek Nation v. United States, 78 Ct. Cls. 474. In that case at page 489, we said:
Section 19 of the Curtis Act [June 28, 1898, 30 Stat. 495] changed only the manner in which the Creek tribal funds' were to be disbursed. Neither that section nor *379 any other provisions of the act defines or limits in any way the purposes for which the tribal funds might be expended. These funds were no longer paid into the Creels National Treasury by the United States for the purpose of disbursement by the tribal authorities, but were retained in the Treasury of the United States to the credit of the tribe, and were disbursed by the Secretary of the Interior. The disbursements complained of were largely for the purposes identical with those for which the funds had been expended during the preceding years by the tribal authorities. Congress undoubtedly contemplated and intended that the tribal funds would continue to be expended in the future, as they had been in the past, for the benefit of the Creek Nation and its people. Consequently, we think that when Congress, by the provisions of section 19 of the Curtis Act, took away from the Creek tribal authorities the control which they had formerly exercised over the disbursement of their tribal funds and charged the Secretary of the Interior with the duty of disbursing the funds, without defining or limiting the purposes for which they might be expended, it, by clear and necessary implication, invested him with authority to disburse and expend the funds in such manner and for such purposes as would, in his judgment, satisfy the needs of the Creek Nation and promote the welfare and happiness of its citizens, subject to such limitations as Congress might subsequently impose.
In any event the amount, if allowable, would be subject to an offset in a like amount under the offset statute of 1935.
In the next claim plaintiff seeks to recover $500 (finding 13) representing a disbursement from plaintiff’s funds for the cost of erecting a monument to Green McCurtain, late deceased Chief of the Choctaw Nation, which was provided for and authorized by the act of June 30, 1913. (38 Stat. 77, 97.) Plaintiff contends that although this expenditure was authorized by Congress, it was an unwarranted and illegal charge against its funds under the Atoka and Supplemental agreements. For the reasons heretofore given this contention cannot be sustained. This was not a taking of plaintiff’s funds by the government for its own benefit or for the benefit of another, and Congress possessed plenary authority to direct the use of Indian funds for any purpose which it considered to be for their benefit. The *380 nature of the purpose of the expenditure and the extent of the benefit is a matter of policy resting solely with Congress. Chickasaw Nation v. United States, 87 Ct. Cls. 91, 94, 95; Chippewa Indians v. United States, 88 Ct. Cls. 1, 307 U. S. 1.
Plaintiff next claims $137,579, representing payments made to certain newly enrolled members of the plaintiff tribe (finding 14). It insists, first, that these payments were not authorized by, and were contrary to, the Atoka and Supplemental agreements, since such agreements provided only for an equal division of the lands and contemplated only that each member should receive land of the value of $1,041.28; second, that Congress was without authority in view of the provisions of the agreements to so use the tribal funds; and third, that the payments made during the fiscal years 1916 to 1924, inclusive, amounting to $112,388.15, were unauthorized and therefore illegal for the asserted reason that the provision for payments in lieu of allotments (p. 600) in the Appropriation Act of August 1, 1914 (38 Stat. 582, 600) applied only to such payments as were made during the fiscal year ending June 30, 1915. These contentions cannot be sustained.
The act of August 1, 1914, supra, p. 600, provided as follows:
The Secretary of the Interior is hereby authorized to enroll on the proper respective rolls of the Five'Civilized Tribes, as indicated, the persons enumerated in Senate Document Numbered Four hundred and seventy-eight, Sixty-third Congress, second session; Provided, That when so enrolled there shall be paid to each and every such person out of the funds in the Treasury of the United States to the credit of the respective tribe with which such person is enrolled the following sums in lieu of an allotment of land: * * * to each such person placed on the Choctaw * * * rolls, a sum equal to twice the appraised value of the allotment of such tribe as fixed by the Commission to the Five Civilized Tribes for allotment purposes: * * *.
This is a general provision and clearly was not limited to such payments as might be made in the fiscal year 1915. We think the quoted provision completely answers plaintiff’s con- *381 teiítion, and that the claim is without merit. Obviously it was the intention of Congress to equalize, as far as could be done, the benefits which the members of the tribe would receive from the Indian lands, and inasmuch as these disbursements were made subsequent to the time the allotments had been made and subsequent to the time when all of the un-alloted lands had been ordered sold, and most of which had been sold, it was the manifest purpose of Congress to do justice to the Indians by making to them these payments of money instead of lands in order that they might receive full measure in value of what they would then have possessed had they theretofore received allotments. The appraised value of the allotments determined the basis of the amount they were to receive. It is clear that Congress possessed the authority to do what was done. Chickasaw Nation v. United States, supra; Chippewa Indians v. United States, supra.
Plaintiff nest claims $201.56 disbursed from its funds to cover the expense of making payments to equalize allotments (finding 15), on the ground that while no claim is made for the payments made in order to equalize allotments the expense of so doing was a proper charge against the government under the provision of the Atoka agreement that each allottee would be put in possession of his allotment without expense to him. The provision relied upon is not applicable to this disbursement. This was a general expense incident to making the payments for the purpose of equalizing allotments. The provision relied upon only contemplated that of the hundreds of allottees the government would see to it, as a matter between the government and each individual allottee, that he should be put in possession of the particular tract allotted to him, so that one Indian would not get an allotment made to another, and to bear whatever expense that might be necessary for that purpose. No recovery can be had on this item. The expense was one properly payable under the Atoka and Supplemental agreements, and, in addition, since the disbursement was made prior to the act of August 24, 1912, 37 Stat. 518, 531, the Secretary of the Interior had implied authority to make it. Creek case, 78 C. Cls. 474.
Plaintiff next claims $1,089.60 disbursed from 1920 to 1929, from the joint account for medical attention (finding 16). *382 The right to judgment for this amount is based solely up'on the ground that Congress did not give authority and make an appropriation therefor, and therefore under the proviso of the act of August 24, 1912 (37 Stat. 518), at p. 531, that «* * * no moneys shall be expended from the tribal funds * * * without specific appropriation by Congress * * the amount is recoverable. This item was a disbursement from tribal funds for the direct benefit of the tribe, and, if allowed, would for the reasons hereinbefore given be subject to an offset in a like amount under the provisions of the offset statute of 1935. In the final analysis the offset statute of August 12, 1935, 49 Stat. 571, controls here over the provision above quoted from the act of 1912. The result must be the same as it would be if this disbursement had been made from public funds and defendant was now asserting it as an offset under the act of 1935 against an amount otherwise due plaintiff.
Plaintiff next seeks to recover $38,416.27 disbursed for the purposes and under the circumstances set forth in finding 17. Plaintiff contends, first, that this Avas an expense which the defendant was obligated to bear under the Supplemental Atoka agreement, and second, in the alternative, that $916.27 of the disbursement was without specific authority or appropriation by Congress. The first contention cannot be sustained for the reason, as we have held, that the agreements contemplated and intended that such expense would be borne by plaintiff’s funds. To the extent, therefore, of the disbursements made prior to the fiscal year 1913, the Secretary had express and implied authority to make them. The excess was a disbursement for the benefit of plaintiff and, if judgment should be given therefor, it would be offset by a like amount under the act of 1935. The claim is therefore denied.
Plaintiff next seeks to recover $5,439.44 disbursed from its funds for expenses of the office of the Supervisor of Mines on plaintiff’s lands (finding 18). This disbursement was made prior to the fiscal year 1913, and under the decision in the Greek case the Secretary possessed implied authority to make it. In any event it was an expenditure for the benefit of plaintiff rather than for the government and judg *383 ment may not be entered therefor under the offset act of 1935.
Plaintiff next seeks judgment for $12,117.72 (finding 19) made up of disbursements of $8,186.68 for insurance on sanitarium, $297.25 for miscellaneous hospital employees, and $3,633.79 for roads and grounds. Plaintiff is not entitled to judgment for this item for the reason that authority was given for the disbursement for roads and grounds by the act of March 2, 1917 (39 Stat. 969), and for the reason that the amounts were disbursed solely for the benefit of plaintiff tribe.
The next amount sought to be recovered is $22,499.33 disbursed in 1911 and 1912 for expenses incident to appraising timber (finding 20). Plaintiff cannot recover on this item for several reasons. First, no agreement between plaintiff and the defendant imposed upon the latter the obligation of this expense which was in the interest and benefit of plaintiff. Second, the disbursement was made prior to 1913 and under the Curtis Act the Secretary possessed implied authority therefor since it was considered necessary in plaintiff’s interest and the same was made in connection with and as a part of a duty specifically required of him under the Supplemental agreement. Creek Nation v. United States, supra. Third, the expense was authorized and appropriated for in a reimbursable appropriation in the act of March 4, 1911 (36 Stat. 1289), at p. 1309, as follows:
Administration of affairs of the Five Civilized Tribes: For expense of administration of affairs of the Five Civilized Tribes, Oklahoma, in the completion of the work heretofore required by law to be done by the Commissioner to the Five Civilized Tribes, including salaries of employees and expenses incident to the selling of the unallotted lands of the Five Civilized Tribes, and in the reappraisement and selling of the unallotted timber lands of the Choctaw Nation and the timber thereon; the amount appropriated to be reimbursable from the proceeds of the sales of said lands and timber, thirty thousand dollars.
Plaintiff next seeks to recover $15,457.32 disbursed from its funds in 1908 to 1912, inclusive, pursuant to and under the authority of section 7 of the act of May 29, 1908 *384 (finding 21). This section (35 Stat. 444, 446) provided as follows:
That in addition to the towns heretofore segregated, surveyed, and scheduled in accordance with law, the Secretary of the Interior be, and he is hereby, authorized to segregate and survey within that part of the territory of the Choctaw and Chickasaw nations, State of Oklahoma, heretofore segregated as coal and asphalt land, such other towns, parts of towns, or town lots, as are now in existence, or which he may deem it desirable to establish. He shall cause the surface of the lots in such towns or parts of towns to be appraised, scheduled, and sold at the rates, on the terms, and with the same character of estate as is provided in section twenty-nine of the Act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight (Thirtieth Statutes at Large, page four hundred and ninety-five), under regulations to- be prescribed by him. That the provisions of section thirteen of the Act of Congress approved April twenty-sixth, nineteen hundred and six (Thirty-fourth Statutes at Large, page one hundred and thirty-seven), shall not apply to town lots appraised and sold as provided herein. That all expenses incurred in surveying, platting, and selling the lots in any town or parts of towns shall be paid from the proceeds of the sale of town lots of the nation in which such town is situate.
Plaintiff bases its right to recover the amount of this disbursement upon the provision in the Atoka agreement (Sec. 29, act of June 28, 1898, 30 Stat. 495, 508-9) “That no charge or claim shall be made against the Choctaw or Chickasaw tribes by the United States for the expenses of surveying and platting the lands and town sites, or for grading, appraising, and allotting the lands, or for appraising and disposing of the town lots as herein provided” [italics supplied), and contends that the terms of this agreement “were violated when the Secretary disbursed' Choctaw funds to defray this expense under the authorization contained in the act of May 29, 1908, supra.” If the quoted provision of the agreement is applicable to the towns and town lots on the segregated coal and asphalt land as specified in the act of 1908, also quoted, then plaintiff is entitled to recover on this item for the reason that the government *385 cannot escape responsibility for an obligation solemnly assumed by using plaintiff’s funds to discharge it. However, we are of opinion that the provision of the Atoka agreement relied upon is not applicable to the towns, parts of towns, and town lots provided fo.r in the act of 1908 when considered in connection with other provisions of the Atoka agreement with reference to town sites and lots; the act of May 31,1900 (31 Stat. 221, 237-8), and the Supplemental Atoka agreement approved July 1, 1902, 32 Stat. 641. The only basis on which plaintiff connects the provisions of section 7 of the act of 1908 with the town lots mentioned in the Atoka agreement, and which is, we think, the only basis for any connection, is the fact that the 1908 act relates to town sites and town lots. But this is not enough. The towns, parts of towns, and lots specified in the 1908 act were not the town sites and lots contemplated and referred to by the Atoka agreement. This agreement provided with reference to town sites, that “there shall be appointed a commission for each of the two nations. * * * Each of said commissions shall lay out town sites, to be restricted as far as possible to their present limits, where towns are now located in the nation, for which said commission is appointed.” [Italics supplied.] The agreement then provided that “When said towns are so laid out, each lot,” together with improvements, should be appraised and sold under certain conditions and on' certain terms. Then followed the provision that no charge or claim-would be made for the expenses of surveying and platting the town sites, or for appraising and selling the town lots “as herein provided.” From this it seems clear that the defendant only assumed the obligation of paying the expenses incident to sale of the town lots in towns then located on the reservation and laid out, surveyed, and platted by the Commission. We find nothing in the act of 1900 or the Supplemental agreement that amended, enlarged, or extended the expense provision of the original Atoka agreement. For these reasons plaintiff is not entitled to recover.
The next claim of plaintiff is for $158,038.05 made up, first, of $147,491.36 as its share of interest at the rate of 5 percent per annum alleged to have become due, not as interest but *386 as a part of just compensation, but which was not paid on a judgment against the defendant for $606,936.08 entered by this court in the case of United States v. The Choctaw Nation et al., 38 C. Cls. 558, affirmed 193 U. S. 115; and, second, of $10,546.69, the alleged deficiency in the payment of its share of the. $606,936.08 (finding 22)..
Plaintiff contends as to the first amount that its land was taken by the United States and allotted to the Chickasaw freedmen (former slaves of the tribe) who were not entitled to such land as a matter of right or under any treaty or agreement ; that when this court and the Supreme Court held that the freedmen were not entitled to allotments independently of the Supplemental Atoka agreement dated March 21, 1902, ratified July 1,1902 (32 Stat. 641, 649-651), in which provision was made for the determination of the question by this court, it became entitled to just compensation for such land which should have included an amount measured by interest at 5 percent from the date of the decision of the Supreme Court on February 23, 1904, to date of appropriation, June 25,1910; that the value of the land fixed at the'time of allotment subsequent to the agreement of 1902, supra, in the amount of $606,936.08, without the addition of a further sum measured by interest did not amount to just compensation for the alleged taking. In support of these contentions, plaintiff relies upon the rule announced and applied in Untied States v. Creek Nation, 295 U. S. 103, 111, in which the court said:
But the just compensation to be awarded now should not be confined to the value of the lands at the time of the taking but should include such addition thereto as may be required to produce the present full equivalent of that value paid contemporaneously with the taking. Interest at a reasonable rate is a suitable measure by which to ascertain the amount to be added. The treaty of 1866, the Act of 1889, and other statutes show that five percent per annum is a reasonable rate as between the parties here.
The facts and circumstances in the Greek case are not comparable to the facts in the present case. The Greek case is therefore not controlling here. Plaintiff cannot recover the amount claimed solely as interest, for interest is not allowable *387 under section 177 of the Judicial Code as amended (U. S. Code 284, Tit. 28). Nor is interest allowable under section 1090 Revised Statutes (226 U. S. Code, Tit. 31) as the facts do not show either compliance by plaintiff with the provisions thereof, or that any interest would be due thereunder.:
We think in view of the fact set forth in finding 22 and the circumstances hereinafter disclosed that plaintiff is not entitled to recover on this item. The claim arises under the agreement dated March 21, 1902, and ratified by the act of July 1,1902, between plaintiff and the defendant represented by the Commission to the Five Civilized Tribes. Section 11 of this agreement provided in part that “There shall be allotted to each member of the Choctaw and Chickasaw tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to 320 acres of the average allottable land of the Choctaw and Chickasaw nations, and to each Choctaw and Chickasaw freedman, as soon as practicable after- the approval by the Secretary of the Interior of his enrollment, land equal in value to 40 acres of the average allottable land of the Choctaw and Chickasaw nations; * * Section 25 provided in part that “If any citizen or freedman of the Choctaw and Chickasaw nations shall not have selected his allotment within twelve months after the date of the opening of said land offices in said nations, if not herein otherwise provided, and provided that twelve months shall have elapsed-from the date of the approval of his enrollment by the Secretary of the Interior, then the Commission to the Five Civilized Tribes may immediately proceed to select an allotment, * * *”
Section 27 provided in part that “The rolls of the Choctaw and Chickasaw citizens and Choctaw and Chickasaw freedmen shall be made by the Commission to the Five Civilized Tribes, in strict compliance with the act of Congress approved June 28, 1898 (30 Stats. 495), and the act of Congress approved May 31, 1900 (31 Stats. 221), except as herein otherwise provided.”
The Choctaw Nation had in 1883 by appropriate legislation adopted the freedmen of its tribe, but the Chickasaw Nation, having first adopted its freedmen as members of the tribe, *388 repealed such, legislation and refused to adopt the freedmen prior to ratification by Congress of the action first taken. Congress subsequently attempted to ratify the first action. The amount claimed under the item now in question arose out of land allotted only to Chickasaw freedmen. At the time of the agreement of 1902 the government insisted that the Chickasaw freedmen had been adopted and were entitled to allotments, and the Indians insisted that they had not been adopted and were not entitled to allotments. As above stated, it was agreed that the Chickasaw freedmen should be given allotments the same as the Choctaw freedmen, and that the question whether the Chickasaw freedmen had been adopted by the Chickasaw Nation and were entitled to such allotment independent of such agreement of 1902 would be submitted to this court for decision with the right of appeal to the Supreme Court. Therefore, sections 36, 37, and 40, were inserted in the agreement as follows:
36. Authority is hereby conferred upon the Court of Claims to determine the existing controversy respecting the relations of the Chickasaw freedmen to the Chickasaw Nation and the rights of such freedmen in the lands of the Choctaw and Chickasaw nations under the third article of the treaty of eighteen hundred and sixty-six, between the United States and the Choctaw and Chickasaw nations, and under any and all laws subsequently enacted by the Chickasaw legislature or by Congress.
37. To that end the Attorney-General of the United States is hereby directed, on behalf of the United States, to file in said Court of Claims, within sixty days after this agreement becomes effective, a bill of interpleader against the Choctaw and Chickasaw nations and the Chickasaw freedmen, setting forth the existing controversy between the Chickasaw Nation and the Chickasaw freedmen and praying that the defendants thereto be required to interplead and settle their respective rights in such suit.
40. In the meantime the Commission to the Five Civilized Tribes shall make a roll of the Chickasaw freedmen and their descendants, as provided in the Atoka agreement, and shall make allotments to them as provided in this agreement, which said allotments shall be held by the said Chickasaw freedmen, not as temporary allotments, but as final allotments, and in the event *389 that it shall be finally determined in said suit that the Chickasaw freedmen are not, independently of this agreement, entitled to allotments in the Choctaw and Chickasaw lands, the Court of Claims shall render a decree in favor of the Choctaw and Chickasaw nations according- to their respective interests, and against the United States, for the value of the lands so allotted to the Chickasaw freedmen as ascertained by the appraisal thereof made by the Commission to the Five Civilized Tribes for the purpose of allotment, which decree shall take the place of the said lands and shall be in full satisfaction of all claims by the Choctaw and Chickasaw nations against the United States or the said freedmen on account of the taking of the said lands for allotment to said freedmen: Provided, That nothing-contained in this paragraph shall be construed to affect or change the existing status or rights of the two tribes as between themselves respecting the lands taken for allotment to freedmen, or the money, if any, recovered as compensation therefor, as aforesaid.
Sections 38 and 39 related to service of process and the employment and payment of counsel, and are not material here. In the suit brought here, under the above provisions, this court held in United States v. The Choctaw Nation, et al., 38 C. Cls. 558, that the Chickasaw Nation had not adopted its freedmen; that the Chickasaw freedmen having voluntarily remained in the Chickasaw country, their status was as defined by the treaty of 1866; that their relation to the Choctaw and Chickasaw nations was the same as that of citizens of the United States residing there; and that they had no right or interest, independent of the agreement of 1902, supra, in any property held in common by members of the Choctaw or Chickasaw nations, or in the funds of such nations in the hands of the United States. The court, at page 570, entered its decree accordingly on May 25,1903, the language of which was in part as follows:
And it is further ordered that upon the coming in of the roll and appraisal to be made by the Dawes Commission, as referred to in the said statute, the defendants, the Choctaw and Chickasaw nations, have leave to apply for an additional decree to be entered at the foot of this decree determining the amount which shall be paid and allowed by the United States to the said Choctaw and *390 Chickasaw nations, as directed by said statute; and that the complainant, the United States, be at the same time heard in regard to such amount for which judgment shall be rendered against the United States.
This decree was affirmed February 23,1904, 193 U. S. 115. After completion of the allotment rolls and the appraisal of allotments to the freedmen as provided in the 1902 agreement, this court heard the parties further as to the amount of the award for which judgment should be entered against the United States. As a result a judgment was entered January 24, 1910, for $606,936.08, being the value of 4,663 allotments as shown by the rolls to be the number of Chickasaw freedmen entitled to allotments at $130.16 each, as ascertained by the appraisal thereof made by the Commission to the Five Civilized Tribes for the purpose of allotment. Subsequently, on May 9, 1910, this court entered a supplemental decree in which it was provided that the amount of $606,936.08 should be subject to a deduction of $130.16 for each freedman enrolled by the Commission to the Five Civilized Tribes found to have been improperly enrolled, or who failed to receive an allotment, or money in lieu thereof, such deduction not to exceed a total of $13,000. No appeal was taken from this judgment, and no additional amount was asked by plaintiff.
Accordingly, Congress, by the act of June 25, 1910, 36 Stat. 774, 807, 808, appropriated the sum of $606,936.08, or so much thereof as might be necessary, to pay the judgment of this court. The judgment was paid by crediting the amount due to the Choctaw and Chickasaw nations in the proportion of three-fourths to plaintiff and oneTfourth to the Chickasaws, and the amount was subsequently expended or disbursed, in whole or in part, for their benefit.
From the above, it seems clear that the claim for an additional amount measured by interest now being pressed is an integral part of a claim heretofore adjudicated on the merits by this court and the Supreme Court, and that it is therefore expressly excluded from the jurisdiction of this court in this case by section 1 of the jurisdictional act under which this suit was brought. Cherokee Nation v. United States, 82 C. Cls. 456, 474. This act confers upon *391 this court jurisdiction to adjudicate only those claims which “have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States.”
But even if plaintiff is not precluded by the former adjudication and the terms of the jurisdictional act, we are nevertheless of opinion that plaintiff is not entitled to recover for the reason that the amount awarded by this court and paid was fixed and determined strictly in accordance with the agreement of the parties in section 40 of the agreement of 1902 in which it was stipulated that if it should be held that the tribes were entitled to recover, the award to the Indians should be “for the value of the lands so allotted to the Chickasaw freedmen as ascertained by the appraisaU-thereof made by the Commission to the Five Civilized Tribes for the purpose of allotment,” [italics supplied], and that the decree of the court should take the place of the lands, and should be in full satisfaction of dll claims by the Choctaw and Chickasaw nations against the United States. See section 178 of the Judicial Code (section 285, U. S. Code, Tit. 28). In the absence of a waiver of the provisions of the agreement of 1902, there exists no authority in the court to adjudicate the matter further. Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians v. United States, 81 C. Cls. 79, affirmed 296 U. S. 244.
Plaintiff is not entitled to’ recover the second item of $10,546.69 of this claim. Choctaw Nation v. United States, 83 Ct. Cls. 140.
The next claim of plaintiff is for $517,366.52. The facts with reference to the payments and disbursements totaling this amount are set forth in finding 23. We are of opinion that plaintiff is not entitled to recover the amounts here claimed for the reasons, first, since the payments totaling the amount in question were made to the Choctaw National Treasurer subsequent to the passage of the Curtis Act of June 28, 1898, and were paid to such Treasurer for the nation pursuant to and in satisfaction of treaty obligations and were not amounts paid or intended “for disbursements” as therein contemplated, such payments were not in viola *392 tion of section 19 of the Curtis Act; and, second, that the amounts paid to the Choctaw National Treasurer were authorized by Congress in various appropriation acts, which acts, even if in conflict with section 19 of the Curtis Act, were enacted within the exercise of the plenary power of Congress over the affairs, property, and funds of the Indian tribes for their benefit.
We think section 19 of the Curtis Act related only to moneys intended for disbursement per capita or for the purpose of carrying out agreements or acts of Congress concerning matters over which jurisdiction was taken from the tribal government and vested in the Secretary of the Interior when the authority of such tribal government was restricted and, as so limited, continued by the Atoka agreement and subsequent acts of Congress. Section 19 of the Curtis Act is as follows:
That no payment of any moneys on any account whatever shall hereafter be made by the United States to any of the tribal governments or to any officer thereof for disbursement, but payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed by him; and per capita payments shall be made direct to each individual in lawful money of the United States, and the same shall not be liable to the payment of any previously contracted obligation. [Italics ours.]
We think the words “all sums” as used in the second clause of the section relate to the same “moneys” mentioned in the first. The words “payments * * * to members of said tribes” as used in the second clause has the same meaning as the word “disbursement” in the first clause. In other words, it appears that the restriction against payments intended for disbursement in the first clause is expressly carried over and rephi’ased in the second clause. For this reason we think the first clause was intended to change the method of “making payments of all sums to members of said tribes;” and that ¡the second clause was intended to supply a new method and directed that “payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed by him.”
*393 Section 3 of the jurisdictional act provides that any payment which may have been made by the United States upon any claim thereunder against the United States shall not operate as an estoppel but may be pleaded as an offset, and the act of 1935 provides that any gratuitous payment for the benefit of the tribe shall be offset by the court against any claim made by such tribe. Since the amount involved was paid by the defendant pursuant to and in accordance with treaty obligations assumed, it cannot be made to pay the amount the second time. Since the amounts so paid to the nation were made in strict compliance with the treaty and were for the benefit of the tribe, they would, if allowable, be subject to an offset by a like- amount under the act of 1935. Although this claim was not asserted in the original or amended petitions, but was first asserted in a second amended petition filed more than five years after the approval of the jurisdictional act contrary to the provisions of section 2 of such act (United States v. Seminole Nation, 299 U. S. 417), this defect was remedied by the act of August 16, 1937, 50 Stat. 650.
The next item of plaintiff’s claim is for $46,866.45 (finding 2'4) which plaintiff contends was disbursed from its funds for unauthorized and illegal purposes. In support of this claim it is contended that the disbursements were made to cover expenses 'svhich the tribal government did not have power or authority to incur and as to which the tribal government, in the years in which the disbursements were made, was prohibited by agreements and acts of Congress from incurring.
The record does not support plaintiff’s contention. On the contrary the record shows, first, that practically all these disbursements were made in the years mentioned to pay expenses incurred by the tribal government at a time when it had authority to incur such expenses, and for which tribal warrants were issued, and that they were not paid until the years mentioned for the reason that time was required to investigate the validity of the warrants issued by the tribal government and whether they were valid and binding obligations of the nation; and, second, that the disbursements made to pay any *394 expense that may have arisen at the time when the authority of the tribal government-was limited under the Atoka agreement were for payment of expenses properly chargeable to plaintiff tribe and for which the United States had assumed no obligation, and for which it was not liable. -In addition, the Secretary had implied authority to pay from plaintiff’s funds $45,116.38 of the total disbursements made during the years 1910 to 1912, inclusive. Creek Nation v. United States, 78 C. Cls. 474, 489. Finally it is shown by the acts of March 3, 1899, 30 Stat. 1074, 1099, and April 26, 1906, 34 Stat. 137, 141, that the Secretary had express authority to make the disbursements. The act of 1899 provided for payment of all outstanding Choctaw warrants and the act of 1906 authorized the Secretary to investigate and pay tribal warrants. Plaintiff is therefore not entitled to recover on this item.
The next claim of plaintiff is for $978,787.31 and interest of $1,233,907.40 to June 30, 1935, totaling $2,212,694.71, for alleged illegal disbursements of the principal of four interest-bearing trust funds (findings 25 and 27). It is alleged that these trust funds, known as the “Choctaw School Fund,” the “Choctaw Orphan Fund,” the “Choctaw General Fund,” and the “Choctaw 3% Fund,” were provided and set up by treaties and acts of Congress and that the Secretary of the Interior violated such treaties and acts of Congress when he made disbursements from and depleted such trust funds, for the reason that Congress did not at any time specifically authorize the disbursements made from such funds.
The authority of the United States to charge plaintiff with the expenses mentioned for the payment of which certain of these trust funds were used, and the authorization of Congress for and the authority of the Secretary of the Interior to make such disbursements have been hereinbefore and are hereafter discussed and decided under the heading for which each disbursement was made. Plaintiff contends in support of this claim here made that while Congress authorized the expenditure of its money for the purposes for which the Secretary used these trust funds, Congress did not specifically authorize disbursements from these trust funds and, therefore, the amounts paid out must be restored *395 under treaty provisions, and that if it should be held that although allowable the total would be subject to an offset in a like amount on the ground that the funds were used for the plaintiff’s benefit, interest to date of judgment is nevertheless recoverable.
Plaintiff insists that the principal of the four trust funds mentioned in finding 25 was, prior to the passage of the Curtis Act of 1898, definitely restricted both by treaty stipulation and authority of law from disbursement for any purpose; that the legislation contained in the Curtis Act had, .for its effect, the ultimate capitalization of these trust funds and the payment thereof per capita to members of the tribe, with the provision that this should not be done until within one year after, the tribal government should cease; that section 29 of the Curtis Act ratifying the Atoka agreement distinctly provided for the continuation of the tribal government until March 4, 1906, and that since subsequent legislation continued the limited tribal government in existence to the present date, any disbursement from the principal of these trust funds was illegal and unauthorized. Plaintiff concedes that Congress under its broad plenary power over the affairs, property, and funds of the Indian tribes possessed authority insofar as the matter of administration only was concerned to' legally modify existing treaty provisions and legislation so as to make the principal of these trust funds available for distribution (Chippewa Indians of Minnesota v. United States, 88 C. Cls. 1, affirmed 307 U. S. 1), but insists that in order for Congress to do so it must act specifically, and specifically name or designate the fund from which the disbursements for the benefit of the Indians are to be made, and that, in the case of disbursements from the principal of these trust funds, the Congress did not so specifically act. The right and authority of the Congress to charge plaintiff with the disbursements from these trust funds are elsewhere challenged and disposed of.
The contentions now pressed cannot be sustained. The Curtis Act and subsequent acts of Congress were directed to the winding up of the administration of the affairs of the Five Civilized Tribes. United States v. Seminole Nation, *396 supra. In the Atoka agreement it was provided that all the funds of plaintiff invested, in lieu of investment, treaty-funds, or otherwise, then held by the defendant in trust for the tribe Should be capitalized within one year after the tribal government should cease, so far as same might be legally done, and be appropriated and paid by some officer of the United States, appointed for that purpose, to the tribe per capita to aid and assist them in improving their homes and lands. Congress possessed authority, as conceded, to direct the use of these trust funds for any purpose which it deemed for-the best interest of the tribe, even though such use might not be in accordance with provisions of a prior treaty, agreement, or act of Congress. Lone Wolf v. Hitchcock, 187 U. S. 553, 554-567; United States v. Seminole Nation, supra; Chippewa Indians of Minnesota v. United States, supra. We think the acts of Congress under which the disbursements herein were made were sufficiently specific to authorize such disbursements to be made from these trust funds.
With reference to the “Choctaw School Fund,” plaintiff contends that the principal of $49,472.70 of this amount was illegally disbursed without specific authority of Congress. The evidence shows that this amount was disbursed under Congressional authority for the purpose of making per capita payments. With reference to the “Choctaw Orphan Fund” of $39,710.67, the evidence shows that this amount was likewise disbursed .in making per capita payments. It is clear, therefore,' that these two trust funds were disbursed for purposes specified in the Atoka agreement, i. e., for per capita payments. These payments were made pursuant to the act of May 18, 1916, 39 Stat. 123, 146, which authorized such payments to be made “out of any moneys belonging to said tribes in the United States Treasury or deposited in any bank or held by an official under the jurisdiction of the [Secretary of the] Interior.” The provision in the Atoka agreement that the trust fund should be capitalized within one year after the tribal government should cease, and be appropriated and paid per capita, did not remove from Congress its plenary power, notwithstanding the lim *397 ited tribal governments bad not completely ceased to exist, to capitalize sucb funds at an earlier date, and to make per capita payments therefrom at an earlier date. Moreover, the period mentioned in the Atoka agreement for the continuation of the limited tribal agreement ended prior to many of these disbursements. Thereafter it existed only by the will of Congress, and its existence did not deprive Congress of authority to legislate with reference to these funds for the benefit of the tribe.
With reference to the “Choctaw General Fund,” it appears from the first tabulation of finding 25 that $77,149.26 of this fund was paid out in settlement of the Choctaw warrants authorized to be paid by the act of March 3, 1899, 30 Stat. 1099, and the act of April 28, 1904, 33 Stat. 1664. The acts of 1899 and 1904 directed disbursement for this purpose “from the funds in the Treasury belonging to the Choctaw Nation.” This was clearly such a fund. In his annual report to Congress for 1901, the Secretary of the Interior at page 219 specifically called the attention of Congress to the fact that Choctaw warrants were being paid “out of the Choctaw moneys held in trust by the United States.” The record further shows that in 1898 the Choctaw National Council passed an act requesting that the Choctaw warrants mentioned be paid out of their trust funds (Laws of Choctaw Nation for 1898, Supp. Bept., of Secretary of the Interior). Thereafter Congress continued to appropriate for the payments for plaintiff’s benefit in the same language as was used in the act of 1899, after having-been advised by the Secretary of the Interior that an act providing for payments out of funds of the tribe in the Treasury had been, and was being, construed as authority that any funds of the tribe in the Treasury of the United States were available for such payments. We are, therefore, of opinion that the direction by Congress to the Secretary to make payments “from funds in the Treasury belonging to the Choctaw Nation,” and “from any funds” was sufficiently specific to authorize the Secretary to make such payments out of the trust funds. If Congress, after its attention had been called to the matter, had intended that *398 payments already made, or those thereafter to be made under similar appropriations should not have been, or be, made from trust funds, it would have so specified.
With reference to the disbursement of $75,000 from the “General Trust Fund” to the heirs of Albert Pike (finding 25 (b)), it is shown that this payment was made pursuant to the act of March 3, 1901, 31 Stat. 1058, 1078, which appropriated this amount and directed its payment to the heirs of Albert Pike “out of any funds in the Treasury of the United States belonging to the Choctaw Nation.” The payment out of trust funds was, therefore, legal.
With reference to the payment of $346,364.74 to Mansfield, McMurray and Cornish, it is shown that this payment was made for legal services rendered the tribe, and fixed by the Citizenship Court created by sections 32 and 33 of the act of July 1, 1902, 32 Stat. 641, 647-649, in matters coming before that court and pursuant to the provision in the act of March 3, 1903, 32 Stat. 982, 995. The last-mentioned act provided and directed the payment of fees so fixed for such compensation “out of any funds in the Treasury belonging to said nations.” Payment of this amount from the general trust fund was, therefore, legal and proper. Lone Wolf v. Hitchcock, 187 U. S. 553. Chippewa Indians of Minnesota v. United States, 88 C. Cls. 1, affirmed 307 U. S. 1.
With reference to the “Choctaw 3% Fund” of $390,257.92, it appears that $233,047.76 thereof was used in making per capita payments. For the reasons hereinabove stated these payments were legal. They were authorized to be made out of any of plaintiff’s'funds. The balance of this fund was used for certain of the purposes stated in the tabulation in finding 3. We have hereinbefore held that these payments were properly chargeable to plaintiff, and plaintiff now contends, only, that they are recoverable on the ground that Congress did not specifically authorize the use of its trust funds for those purposes. For the reasons hereinbefore stated under this claim, these payments were sufficiently authorized by Congress to be made out of this trust fund. They were made pursuant to authority and direction of Congress that they be paid “out of any moneys” of the tribe, or *399 “the funds” of the tribe, or “out of any funds” of the tribe, or “from the tribal funds” of the tribe. Plaintiff’s claim for interest on the disbursements from these trust funds is hereinafter discussed.
The next claim of plaintiff is for $63,423.11, representing the difference between interest at 5 and at 3 percent per annum from January 1,1908, on the amount of the “Choctaw 3% Fund” (finding 26). This fund was the continuation of an interest-bearing fund provided for and set up under Art. 13 of a treaty of June 22, 1855, 11 Stat. 611, which provided that interest should be paid on the fund therein provided at the rate of not less than 5 percent per annum as follows:
And the funds now held in trust by the United States for the benefit of the Choctaws under former treaties, or otherwise, shall continue to be so held; together with the sum of five hundred thousand dollars out of the amount payable to them under articles eighth and tenth of this agreement, and also whatever balance shall remain, if any, of the amount that shall be allowed the Choctaws, by the Senate, under the¡ twelfth article hereof, after satisfying the just liabilities of the tribe. The sums so to be held in trust shall constitute a general Choctaw fund, yielding an annual interest of not less than five per centum.
In the appropriation act of March 1, 1907, 34 Stat. 1015, at, page 1027, the Congress in making an appropriation to fulfill the obligations of the government under the Choctaw treaty of 1855, sufra, stated as follows:
For interest on three hundred and ninety thousand two hundred and fifty-seven dollars and ninety-two cents [$390,257.92], at five per centum per annum, for education, support of the government, and other beneficial purposes, under the direction of the general council of the Choctaws, in conformity with the provisions contained in the ninth and thirteenth articles of treaty of January twentieth, eighteen hundred and twenty-five [January 20, 1855], and treaty of June twenty-second, eighteen hundred and fifty-five [June 22, 1855], nineteen thousand five hundred and twelve dollars and eighty-nine cents [$19,512.89] ;
*400 That the Secretary of the Treasury is hereby authorized- and directed to place upon the books of the Treasury to the credit of the Choctaw tribe of Indians the sum of three hundred and ninety thousand two hundred and fifty-seven dollars and ninety-two cents [$390,257.92], balance due said tribe under articles ten and thirteen of the treaty of June twenty-second, eighteen hundred and fifty-five [June 22, 1855], (Eleventh Statutes at Large, six hundred and eleven) [11 Stat. 61Í], and the same shall draw interest at three per centum per annum.
At the time of the enactment of this Act the fund of $390,257.92 was already a trust fund under the treaty of 1855 bearing interest at 5 percent thereunder.
The defendant contends that the reduction of interest from 5 percent, as provided in the treaty, to 3 percent, as mentioned in the Act of 1907, was a proper exercise by Congress of its plenary power over the property and funds of the Indian tribe; that authority of Congress is unlimited so long as it is exercised for the benefit of the tribe. But it is clearly established that the government cannot use for the benefit of another or for its own benefit, the funds of the tribe or the amounts due them by the government under an obligation solemnly assumed, and it has been uniformly held that where the government assumes a treaty obligation to make a definite payment it must do so. In this instance the government by reducing the interest rate specified and agx'eed to in the treaty of 1855 failed to fulfill its obligation thereunder, and, thereby, received the use of the funds of plaintiff represented by the difference between interest at the rate of 5 and of 3 percent for its own benefit subsequent to January 1,1908.
In the case of Lone Wolf v. Hitchcock, 187 U. S. 553, the court had before it the question of the constitutional power of Congress by an act to abrogate, change, or modify a provision in a treaty or agreement with Indian tribes with respect to the handling, administration, and disposition of their property and funds for their benefit. The court held that Congress possessed such power and that under the act of March 3,1871, embodied in section 2079 of the Revised Statutes, this might be done by legislation. The court said at *401 page 565 that “Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be 'controlled by the Judicial Department of the government. Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf. But, as with treaties made with foreign nations, Chinese Exclusion Case, 180 U. S. 581, 600, the legislative power might pass laws in confÁct with treaties made with the Indians.” The court further stated at page 566 that “The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised- only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so.”
Neither the record, in this case nor the act of 1907 show that the reduction in the rate of interest from that stipulated in the treaty was brought about or based upon any consideration of necessity of the government or the Indians. The obligation which the government had assumed under the treaty of 1855 was based upon a valuable consideration passing from the plaintiff to the government. This payment of interest at 5 percent was one of the promises made by the government in exchange for valuable rights granted by the Indian tribe. It may not, therefore, be escaped without adequate justification, for, as was said by the court in Choate v. Trapp, 224, U. S. 665, 671, “But .there is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rights acquired under such law. Reichert v. Felps, 6 Wall. 160.” And, further at page-674, the court said. “It is conceded that no right which was actually conferred on the Indians can be arbitrarily abrogated by statute.” In Lane et al. v. Pueblo of Santa Rosa, 249 U. S. 110, 113, the court, in answer to the contention of the government that property of the Indians, in consequence of their being wards of the United States, was *402 subject to such regulation as Congress might prescribe, stated that “Certainly it would not justify the defendants in treating the lands of these Indians — to which, according to the bill, they have a complete and perfect title — as public lands of the United States and disposing of the same under the public land laws. That would not be an exercise of guardianship, but an act of confiscation.” In Chippewa Indians of Minnesota et al. v. United States, 301 U. S. 358, 375, the court said: “Our decisions, while recognizing that the government has power to control and manage the property and affairs of its Indian wards in good faith and for their welfare, show that this power is subject to limitations and does not enable the government to give the lands of one tribe or band to another or deal with them as its own. Lane v. Pueblo of Santa Rosa, 249 U. S. 110, 113; United States v. Creek Nation, 295 U. S. 103, 109-110; Shoshone Tribe of Indians v. United States, 299 U. S. 476, 497.” Plaintiff is entitled to judgment for this item of $63,423.11.
The next claim of plaintiff is for interest at 5 percent per annum on the total amount of $2,422,383.01 representing alleged illegal disbursements from its interest and non-interest-bearing funds.
If plaintiff were entitled to recover on any or all of the various items making up its total claim, it would only be entitled to recover interest on those amounts disbursed from interest-bearing funds from the date of such disbursements. The amount of interest on disbursements from interest-bearing funds, computed to June 30, 1935, is $1,233,907.40 (finding 27). But as we have held that plaintiff is not entitled to recover on any of such items, it is not entitled to recover any interest.
This leaves for decision the final claim which presents the question whether interest is recoverable on the item of :$63,423.11 (finding 26). Interest, as such, or as damages, is not payable on such claim under section 177 of the Judicial ’Code, and the provision of Art. 13 of the treaty of 1855 did not require that interest therein provided should become a part of the trust fund. Inasmuch, therefore, as plaintiff’s right to recover this amount grows out of a contract obliga- *403 iion of tbe government and results from its failure to fulfill its obligation in that regard, no additional amount measured by interest is allowable as a part of just compensation for a taking of property under the Fifth Amendment. Failure to pay the stipulated interest was not a taking of property under the Constitution.
OFFSETS , FOE GRATUITOUS EXPENDITURES
The gratuitous expenditures made by the defendant from public funds for the benefit of the plaintiff tribe and without obligation therefor under any treaty or agreement, and which were expended for such purpose under other than treaty or contractual appropriations, are set forth in findings 28 to 40 as disclosed by the record and the accounting reports for the period 1806 to 1934, inclusive. The total of these gratuitous expenditures, which we think the government had not obligated itself to bear under any treaty or agreement with plaintiff, is $3,825,152.26 (finding 40).
As shown under the various offset findings, plaintiff concedes that if any offset for gratuitous expenditures is proper under the offset statute of August 12,1935, 49 Stat. 571, 596, the amount of $63,450.26 expended gratuitously subsequent to the treaty dated April 27, 1855, and ratified June 22, 1855 (11 Stat. 611), is a proper offset. The remaining gratuitous expenditures are objected to by plaintiff for the reasons set forth under each finding and which need not be repeated here. The grounds of plaintiff’s objections to the offsets are (1) that the act of August 12,1935, authorizing the defendant to plead gratuities as offsets is unconstitutional because it is retroactive legislation and therefore deprives plaintiff of vested rights by taking from the court its power to administer justice between the parties and attempts to apply an arbitrary rule to the decision of a matter over which the court was theretofore given exclusive jurisdiction by the jurisdictional act of June 7, 1924, 43 Stat. 537; (2) that all expenditures made prior to the date on which plaintiff’s first claim arose are not proper offsets; (3) that many of the disbursements ■set forth as gratuity expenditures were expenditures made pursuant to obligations assumed by the United States under *404 stipulations of treaties and agreements and are therefore not proper offsets; and (4) that many of the disbursements represent expenditures made for the benefit of individual Indians or a limited class rather than for the benefit of the tribe as- a whole and are therefore not proper offsets.
The claim of unconstitutionality is without merit. De-Groot v. United States, 5 Wall. 419; Gordon v. United States, 7 Wall. 188; Ex Parte Russell, 13 Wall. 664; United States v. Gleeson, 124 U. S. 255; Johnson v. United States, 160 U. S. 546; United States v. Heinszen, 206 U. S. 370, 387; Thurston v. United States, 232 U. S. 469; Chase et al. v. United States, 50 C. Cls. 293. Plaintiff had no vested right to sue the United States and Congress could at' any time modify the remedy given. The jurisdictional act admitted no liability The act of 1935 did not limit the liability but was simply the exercise by Congress of its authority to charge plaintiff with such sums expended for its benefit as would constitute a charge on public funds. There is nothing in the act which deprives the court of any proper judicial function.
Plaintiff incorrectly interprets the act of August 12, 1935, when it claims that such act authorizes the offset only of gratuitous expenditures which were made subsequent to the date on which any of the allowed claims of plaintiff arose. The act plainly states that only those gratuitous expenditures made prior to the date of the law, treaty, agreement; or Executive order under which the claim or claims arose shall not be offset against the claim, or claims, asserted- and allowed. It is therefore clear that the date of the law, treaty, or agreement, which gives plaintiff the right to the claim made, controls as to gratuitous expenditures that may be asserted by the defendant and allowed as offsets. It seems obvious that the controlling date of the gratuitous expenditures for the purpose of offsets is not the date on which the government acted or omitted to perform some duty which resulted in plaintiff being deprived of certain property or funds. A claim arises under a treaty, agreement, or act of Congress which confers the right to claim, rather than the act which took away the right. In this view, only *405 those expenditures made gratuitously and without obligation by the government for the benefit of plaintiff subsequent to the treaty dated June 22, 1855, which is the earliest treaty under which any claims are asserted by plaintiff, and those expenditures made after subsequent treaties and agreements, under which other claims are asserted by plaintiff, constitute proper offsets against such claim or claims. Therefore, the gratuitous expenditures made prior to the fiscal year ending June 80, 1855, and asserted by the defendant, as shown in findings 28, 29, and 80, may not, in whole or in part, be treated a,s offsets against any claim asserted by plaintiff in this case.
Plaintiff concedes offsets and gratuitous expenditures for its benefit subsequent to the fiscal year ending June 30, 1855, in the total amount of $63,450.26 (findings 31, 32, 33, 35, 36, and 38). This is in excess of the only claim of plaintiff which we have allowed in this case under finding 26 in the amount of'$63,423.11, which arose under Art. 13 of the treaty of June 22, 1855. In these circumstances it is unnecessary to consider and discuss in detail the other objections made by plaintiff to certain of the gratuitous expenditures for the benefit of plaintiff tribe on the ground that they were expenditures for obligations assumed by the government under treaties and agreements or made for the benefit of the individual Indians rather than for the benefit of all the members of the tribes.- These objections have been carefully considered and we believe them to be without merit. Blackfeet et al. Tribes of Indians v. United States, 81 C. Cls., 101; The Crow Nation or Tribe of Indians of Montano v. United States, 81 C. Cls. 238; Eastern or Emigrant Cherokees v. United States, 82 C. Cls. 180; Shoshone Tribe of Indians v. United States, 82 C. Cls. 23, 55-59, 93, 94; also 84 C. Cls. 641; Klamath and Moadac Tribes of Indians v. United States, 82 C. Cls. 699.
Plaintiff’s petition is dismissed. It is so ordered.
WhitakeR, Judge; GeeeN, Judge; and Whaley, Chief Justice, concur.
Williams, Judge, took no part in the decision of this case.